In re ROYAL COMPOSING ROOM, INC., Debtor.

Bankruptcy No. 86 B 10435 (PBA).

United States Bankruptcy Court, S.D. New York.

June 16, 1986.

As Corrected June 25, 1986.

---

404

Gelberg & Abrams, (Michael D. Hess, Stanley Bernstein, Liza A. Bosworth of counsel), Milgrim Thomajan Jacobs & Lee, New York City, for debtor.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City, (Andrew S. Hoffmann of counsel), for New York Typographical Union No. 6.

### DECISION ON DEBTOR'S MOTION FOR APPROVAL OF REJECTION OF COLLECTIVE BARGAINING AGREEMENT

PRUDENCE B. ABRAM, Bankruptcy Judge:

A struggle for survival by apparently endangered species is at the core of the disputes raised by this motion by a debtor to reject a collective bargaining agreement. The debtor, Royal Composing Room, Inc. ("Royal"), is one of the last unionized advertising typography shops in New York City. The union, New York Typographical Union No. 6 ("Union"), has seen its membership decline rapidly since 1975, when virtually all advertising typography shops were unionized. The Union's 1975 multiemployer contract with the Printers League, which includes financial printers in addition to typographers, will expire in September 1989 and prospects for renewal are uncertain. Advertising typography itself is in the midst of radical change. Dramatic technological changes since 1976 have converted an industry that for the previous sixty years had relied on the linotype machine to one that relies today on the latest computer technology. The print advertising industry itself began to change in the 1950's with the advent of television. Advertising agencies, the prime customers of advertising typographers, are now merging to form mega-agencies and acquiring the equipment to perform typography work themselves.

The Debtor's Chapter 11 petition was filed on March 14, 1986. The seven days of trial on the Debtor's rejection motion which was filed on March 19, began on May 8 and concluded May 28. Coincidentally, the Third Circuit issued its decision on the appeal from an order permitting rejection of a collective bargaining agreement in the Wheeling-Pittsburg Steel Corporation Chapter 11 case on May 28.

Both sides have appealed to this court's sense of equity, one seeking to have the application denied, the other seeking to have it granted. Several centuries ago, John Selden wrote:

"Equity is according to the conscience of him that is Chancellor, and as that is larger or narrower, so is equity. 'Tis all one as if they should make the standard for the measure we call a 'foot', a Chancellor's foot; what an uncertain measure

this would be! One Chancellor has a long foot, another a short foot, a third an indifferent foot. 'Tis the same thing in the Chancellor's conscience."

For the reasons which follow, the court has determined that it should grant the Debtor's application for rejection of its collective bargaining agreement. This court is powerless to impose contractual modifications on the parties, even if that were the equitable outcome. It can only permit rejection or not. After rejection, a debtor must still bargain with the union. If the changes this Debtor imposes after rejection are unacceptable, the employees are free to resign or strike.

The tragedy of this case is that despite the high stakes the Debtor and the Union have been unable to negotiate a solution either before the trial started or thereafter. The Debtor made it clear that it would close its doors if rejection were not permitted because of its inability to obtain necessary modifications from the Union. The Union made it clear that the workers would in all likelihood strike if rejection were permitted, which strike alone could force the Debtor to close permanently. In either case, the jobs of the present 31 Union workers and 40 non-Union workers would be lost, with resulting hardships on themselves and their families [1] and possible losses to creditors, and the shareholders will lose a business to which they have devoted the whole of their working lives. Reasonable people faced with these stakes should have been able to effect a workable compromise.

Code § 1113 provides no mechanism for the court to appoint anyone to assist the parties in their negotiations or to mediate their disputes. Until Congress provides for the appointment of a mediator in the event of a motion for rejection in a Chapter 11, the negotiations remain in the hands of the debtor and the union.[2]

The legislative history of Code § 1113 contains repeated references to the necessity for negotiations between the debtor and the union before the court can act to permit rejection.

1. The wage scale for the Union workers ranges from $669.29 to $742.91 per week. Including overscale only, the annual wages of union members range from $34,803.08 to $63,687.52. If fringe benefits and employers' obligations for social security and the like are included, the annual wage cost ranges from $54,361.82 to $96,167.82.

The majority of Royal's non-union employees are messengers, who are paid the federal minimum wage. The bookkeeping and billing and pricing employees receive $15–$25,000 per year. Royal's controller is paid approximately $40,000 per year. Royal's non-union workers have for the most part been with Royal for over 6 years.

2. There are other provisions which might potentially be used for this purpose. For example, Code § 105(a), the so-called all-writs section, might permit creation of the office of "labor negotiator." Compare *In re Johns-Mansville Corp.,* 36 B.R. 743, 758 (Bankr.S.D.N.Y.1984) (Appointment of representative for future claimants appropriate as "courts readily use their equitable powers to protect the substantive rights of persons similarly situated who are not before the court."), leave to appeal denied, 39 B.R. 234 (D.C.S.D.N.Y.1984). See also *U.S. v. Sutton,* 786 F.2d 1305, 1307 (5th Cir.1986) (Code § 105(a) simply authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the substantive provisions of the Bankruptcy Code.) A trustee would supplant the debtor-in-possession, not assist it. An examiner's role is investigative. The court need not consider whether a special master might be able to so function as the bankruptcy court is forbidden to appoint a special master. See Bankruptcy Rule 9031. Although the bankruptcy court could appoint an expert under Rule 706(a) of the Federal Rules of Evidence, an expert's function would appear to be limited to rendering opinions to assist the court as the trier of the fact to understand the evidence or to determine a fact in issue. See Rule 702 of the Federal Rules of Evidence and Bankruptcy Rule 9017. Under Fed.R.Civ.Pro. 16, made applicable by Rule 7016, a judge may direct the parties to appear for a conference before trial for, among other purposes, facilitating the settlement of the case. The court's role as trier of fact makes it preferable that a third party be involved if, as here, settlement negotiations are likely to be extensive or require discussion of matters that are unlikely to become matters of record at any trial. This court concludes that, until Congress explicitly provides for the court to intrude on the parties' labor negotiations in this way, the court should not attempt to innovate. The parties could perhaps contract for the appointment of a labor mediator in the event of a Chapter 11 filing by the employer.

"In sum, * * * this conference report, consistent with the intent of Congress in the National Labor Relations Act, provides that the company must try to negotiate with employees to work out the changes necessary to prevent the company from failing. The legislation also embodies the principle of the NLRA by requiring the company to bargain in good faith." Statement of Senator Moynihan at XX–91.[3]

"After the proposal is made, and until a hearing on the motion to reject, the parties must bargain in good faith. This provision places the primary focus on the private collective-bargaining process and not in the courts. * * * The amendments also prohibit the trustee from unilaterally altering or terminating the labor agreement prior to compliance with the provisions of the Section. This provision encourages the collective bargaining process, so basic to federal labor policy." Senator Packwood at XX–83–XX–84.

"The phrase 'without good cause' in subsection (c)(2) of new Section 1113 * * * is intended to ensure that a continuing process of good faith negotiations will take place before court involvement * * *. In deference to the overall policy of the provision which is to encourage the parties to reach their own agreement through collective bargaining, the court in framing any such relief may not go beyond the proposal made by the trustee pursuant to subsection (b)(1)(A)." Representative Morrison at XX–33–XX–34.

"This provision will require negotiations to attempt to save both the labor contract and the business prior to court adjudication to reject the contract. * * * The business must make an offer to its employees' union representatives that strive to both preserve the collective bar-gaining agreement and permit a successful reorganization. That offer should make 'those necessary modifications' in the contract as 'are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all the affected parties are treated fairly and equitably.' The intent of this provision is to allow the business to make whatever changes in the collective bargaining agreement are reasonably necessary to ensure the likelihood of a successful reorganization. The provision emphasizes that the inevitable balancing that will go into this attempt to save both the business and the labor contract must reasonably assure the fair and equitable treatment of all those affected by the reorganization effort. *This fair and equitable treatment language was intended by the conference to ensure that the type of balancing of all the equities that takes place when the court finally rules on rejection also takes place during these preliminary negotiations.*" Senator Hatch at XX–58 and XX–60–61. (Emphasis added).

█ This court eschews the talismanic nine-step analysis of Bankruptcy Code § 1113 first used in *In re American Provision Co.*, 44 B.R. 907 (Bankr.D.Minn.1984). Instead, this court looks to the three interdependent findings required by Code § 1113(c).[4] See Gibson, New Law on Rejection of Collective Bargaining Agreements in Chapter 11: An Analysis of 11 U.S.C. § 1113, 58 Am.B.L.J. 325, 335 (1984) (hereafter "Gibson"). Compare *In re K & B Mounting, Inc.*, 50 B.R. 460 (Bankr.N.D. Ind.1985). The court, however, reverses the usual order in which the three are considered. Although Code § 1113(c)(1) starts with the debtor's proposal, this court declines to make the debtor's proposal it-

---

**3.** The citations are to the legislative history as collated in Collier on Bankruptcy, 15th Ed. (1985), Appendix 3.

**4.** Code § 1113(c) provides as follows:
"(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

"(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
"(2) the authorized representative of the employees has refused to accept such proposal without good cause; and
"(3) the balance of the equities clearly favors rejection of such agreement."

self the first and foremost topic of consideration as placing such primacy on the proposal inhibits, rather than fosters, the prehearing negotiation process envisioned by Congress as the facts of this case make plain. If the first focus is the debtor's proposal, the rejection process becomes a game of Russian roulette in which the union will stand mute during negotiations in the expectation that the court is apt to find some aspect of the debtor's proposal unnecessary or inequitable.[5] The tactical odds heavily favor the union in that game as few Chapter 11 debtors have the capacity to make a proposal "perfect" without the refining fire of a union's prehearing critique. The necessity for the Debtor's proposal and the equitability of the sacrifice are matters which must be first tested in the crucible of prehearing negotiations. Indeed, the principal purpose of prehearing negotiations is to discuss modifications to the debtor's proposal.

The court is to consider a debtor's proposal only to the extent the proposal was made prior to the commencement of the rejection hearing. Code § 1113(c)(1). It is only sensible that the court have a fixed point in time to look to as otherwise the court would be trying to deal with a constantly moving target as a debtor altered its proposal during the course of the trial. Likewise, a union's prehearing position should be the focus of the trial. For the court to judge a debtor's proposal on grounds articulated by a union for the first time at trial is to permit the union to do that prohibited to the debtor and would defeat Congressional intent that prehearing negotiations be fostered.

A union must articulate and discuss in detail with a debtor during the prehearing negotiations its reasons for declining to accept the debtor's proposal in whole or part. If prehearing, a union has assigned no reason for its refusal to accept a debtor's proposal, it has perforce refused to accept the proposal without good cause under Code § 1113(c)(2).

It is impossible to conceive of a case in which some aspect of the debtor's projections as to its future financial needs, the allocation of burden among the various parties, or some item in the menu of modifications in the union contract proposed by the debtor could not be viewed as unnecessary, inessential or inequitable. Projections are necessarily speculations about the future and are an art, rather than a science. The factors that might influence the equities of the allocation of burden or the necessity for a proposal are numerous.[6] The possi-

---

5. This tactic has been endorsed by at least one commentator. Gibson states:

 "[A] union can safely reject any proposal that is not necessary for the reorganization of the debtor or that unfairly burdens the unionized workers relative to other parties. Any union which rejects a proposal for other reasons, however, does so at its own risk. * * * "This analysis, however, leaves open a large question. Assume that a union is too sophisticated to flatly reject a proposal that meets the 'necessary' and 'fair and equitable' requirements of section 1113(b)(2). Assume that it instead makes a counter-proposal which, while offensive to management and favorable to the union, contains only modifications 'necessary' to the reorganization and 'fair and equitable' to all parties. Is it 'good cause' to reject the debtor's proposal that the union's counter-proposal is equally acceptable under section 1113(b)(2)?" At 341.

 As the balance of this opinion makes clear, this court is of the view that genuine counterproposals by the Union must be encouraged because they assist the parties in reaching a negotiated compromise. If the Union's proposal and the Debtor's proposal were in fact equally acceptable, the balance of the equities, see Code § 1113(c)(3), would not be likely to tip in the Debtor's favor.

6. The Wheeling-Pittsburgh case nicely illustrates this. The Bankruptcy Judge considered and rejected the union's argument that the debtor's proposal was inequitable because it did not provide for any upward adjustment in the labor rate to ensure that the employees would share in whatever benefits might eventuate if the company did better than it had projected:

 "It is relevant to note that the proposal also does *not* provide for any downward adjustment below the $15.20 in the event that the Company continues to lose money. The steel industry and this Company are in serious financial trouble. It might not be inequitable to ask hourly employees to share in future shortfalls, but that has not been done. In any event, the proposal provides cost stability for the Company, and also provides wage stability for Union workers."

ble points of dispute on the details of the Debtor's proposal are infinite. Wage cuts can be traded for benefit cuts, as was done by the Debtor here. Holidays and working hours can be traded off.[7] Only the negotiating process can reveal which of a debtor's proposals on the large issues of how much aggregate relief is required and how much should be apportioned to the union, as well as on the smaller issues of how the union contract cuts should be made, are appropriate or ill-conceived or should be modified and how the difficult problems presented by the economic realities of the debtor's situation can and should be resolved.

 The balance of the equities, see Code § 1113(c)(2), clearly favors rejection when it is apparent that a debtor is in need of substantial relief under a union contract and the bargaining process has failed to produce any results and is unlikely to produce results in the foreseeable future. Bluntly stated, a stonewall by the union favors the grant of the debtor's motion for rejection. Upon rejection, the negotiation process will be revitalized by the alteration in the positions of the players.

In this case, the court finds the Union's posture was essentially a stonewall. Royal initially sought relief from the Union in May 1985. That request was denied. Thereafter, upon learning that it would lose a major client in June 1986, Daniel

Haberman, the chairman of the board of Royal, immediately sought to and did meet on January 17, 1986 with Bertram Powers, President of the Union to request "massive" and "immediate" relief under the Union contract. No relief was granted. Shortly afterwards Mr. Haberman flew to Colorado Springs to discuss the situation with the International. Another meeting occurred on February 12, 1986 at which Royal again unsuccessfully requested relief.

The Debtor attempted to deal with the political problems faced by the Union by resigning the following day, February 13, from the Printers' League and withdrawing the authority of the Printers' League to represent Royal in the negotiation or administration of the collective bargaining agreement. The Debtor recognized that resignation did not relieve it of its obligations under the existing contract. The Debtor was seeking to free the Union to negotiate with the Debtor directly without creating unnecessary problems for the Union with other employers in the multi-employer unit. At that time the Union declined to recognize Royal's resignation, although at trial the Union's attorney conceded that the Debtor was free to resign from the Printers' League.[8]

Royal presented a written proposal for relief at a meeting with the Union on March 3, 1986.[9] Prior to the March 3 meet-

---

*In re Wheeling-Pittsburgh Steel Corp.,* 50 B.R. 969, 980 (Bankr.W.D.Pa.1985).

The Third Circuit did not find this argument persuasive. "The workers did not ask for or need 'wage stability' at a rate they considered substandard. Therefore, such 'stability' cannot be considered to be a benefit to them to compensate for the absence of any share of better-than-anticipated recovery." *In re Wheeling-Pittsburgh Steel Corporation,* 791 F.2d 1074, 1092–93 (3d Cir.1986). The Third Circuit also faulted the Bankruptcy Court for not discussing the "necessity" for the absence of a "snap back" provision. At 1090.

7. Once freed from the shackles of conventional wisdom on a subject the human mind is capable of great flights of creativity as human ingenuity appears to know no bounds. The bankruptcy court must carefully balance a debtor's need to be free of the confining restraints of various terms of a negotiated labor agreement against a

union's desire not to have to renegotiate each and every term of an existing agreement, and thereby reinvent the wheel. The needs to be served must guide the parties to strike a reasoned balance between the new and the old.

8. Even after Royal filed its Chapter 11 petition, the Union still appears to have been concerned that bargaining individually with the Debtor would imperil the contract as it related to other employers, to prospects for the contract's renewal in 1989, and to a pending arbitration in which the Union has sought substantially increased benefits.

9. Royal's March 3 proposal called for (1) elimination of all contributions to the Benefit and Productivity Fund (the "BAP Fund"), a fund established in 1975 to provide compensation to persons laid off as a result of the introduction of new technologies; (2) elimination of all con-

ing, the Union did request relief for Royal from the BAP Fund obligation, and the BAP Fund trustees, of whom Mr. Powers was one, subsequently agreed that it would relieve Royal of about half of its BAP Fund contribution, subject to the BAP Fund accountant inspecting Royal's books and records.[10] At the March 3 meeting, Mr. Powers suggested that Royal create an employee stock option plan but again declined to consider the Debtor's proposal.

After the Chapter 11 petition was filed on March 14, the Debtor immediately sought to meet with the Union but the Union did not meet with the Debtor until March 18, the same day the Debtor obtained an order to show cause fixing March 21 as the day for a hearing on the interim relief portion of its application to reject the collective bargaining agreement.[11] After the March 21 hearing at which the Union did not oppose the request for interim relief,[12] the Union did not meet with the

Debtor again until April 10. Mr. Powers did not attend that meeting. The Union declined to schedule another meeting before April 17. There were no meetings after that. None of the meetings lasted more than an hour or two.

The small number and short length of the meetings had is attributable to the Union. The Debtor was continuously available for and sought other meetings. It is a sad commentary on the prehearing negotiation process in this case for the court to note that the parties spent almost ten times more time in court litigating this matter than in post-petition prehearing negotiations (30 hours compared to about 3.5 hours). At no time prior to May 5, did the Union make a counterproposal, comment item by item on the Debtor's proposal or the Debtor's financial situation, or state any reasons why it found the Debtor's request to be unfair or inequitable.[13]

tributions to the Union Welfare Fund, with Royal to provide substantively comparable coverage directly; (3) elimination of all contributions to the Pension and Annuity Fund, with union employees instead to participate fully in Royal's profit-sharing and 401(k) plans; (4) the work week to be 35 hours, with some employees scheduled for a 4-day work week, particularly in summertime; (5) no April 1, 1986 increase; (6) delete all language giving the Union the right to ask the arbitrator to order any contract changes and the Union to withdraw all existing arbitration demands to Royal and the rest of the industry; and (7) delete Lincoln's Birthday, Columbus Day and Election Day and add the day after Thanksgiving, ½ day Christmas Eve and New Year's Eve and 1 Religious/Ethnic Holiday. Royal's proposal did *not* call for any direct wage reductions and its reductions were directed at elimination of fringe benefit payments which in Royal's opinion did not benefit Royal's union employees, except to a limited extent.

10. Given the result of the prior year's review, Royal was entitled to be skeptical about the likelihood relief would be granted.

11. At about this time, the Union suggested to the Debtor's principals that they would be personally liable under New York law for the amount of interim relief granted on the grounds that such amounts would be unpaid wages. The principals were naturally extremely concerned because of the size of the amounts in question. This matter was resolved by the Union obtaining waivers from the benefit funds of any such

personal liability and obtaining authority from the employees to give a waiver.

12. The interim relief granted Royal relieved it of the obligation to make any payments to any of the four Union benefits funds. These fringe benefit payments total 46.1% of wages. Some appreciation of the extraordinary magnitude of the benefit fund payments can be gained by resort to history. At September 1, 1975, fringe benefits were 10.6222% of wages. As of December 1, 1975 they jumped to 20.6222% of wages. On July 1, 1978, they reached 30.8072%. Less than two years later by April 1, 1981, they had jumped over 40% to 41.8529%.

13. The closest the Union came was in a March 21 affidavit submitted in connection with the hearing on interim relief. The affidavit details what the Union's representative says he was told by its accountant, who had restricted his examination to Royal's short term financial situation. According to the affidavit, the accountant's examination had raised questions about the severity of Royal's short term financial situation and, in particular, its cash needs. The affidavit states that the interim relief request would have (except for one item) no immediate cash flow effect because the amounts were not required to be paid prior to May 1.

There is, of course, a significant difference between a profit-and-loss analysis and a cash flow analysis. A company can be operating profitably and yet have cash flow problems. Conversely, a debtor can be operating at even a

On May 5, a final pretrial conference was held to discuss the trial scheduled to commence on May 8. During the pretrial conference, the Union through its attorney for the first time made a counterproposal. The counterproposal did not conform to the format of or respond directly to Royal's request. Notwithstanding the lack of comparability, it is evident that the Union's counterproposal[14] provided significantly less economic relief to the Debtor than the interim relief which had been granted on March 21 as it did not relieve the Debtor from 2 of the 4 benefit funds and treated any wage cut as a loan.

At trial, Mr. Powers testified that he viewed the Debtor's proposal[15] as an aggregate and responded to it as an aggregate. Mr. Powers is absolutely opposed to any alteration of the existing priority system established by the Union contract and believes that priority is the rock-bed on which American unionism is founded. Because the Debtor's proposal included requests for modifications of the priority system, Mr. Powers declined to respond to particular items of the Debtor's proposal.[16] When questioned regarding specific aspects of the Debtor's proposal Mr. Powers said that labor negotiating strategy generally does not involve negotiating individual points separately from the entire package. Mr. Powers followed that general strategy in this case.

The Union's strategy of focusing on the package would be appropriate if the bargaining were over the *amount* of the relief the Debtor required or the *proportion* of the total relief needed to be allocated to the Union. Once the parties agree on the total and relative amounts, then the focus of the bargaining can turn to the details of modifications in the union contract necessary to produce that amount. At trial, it was apparent that the Union does not agree on the total magnitude of relief the Debtor needs in order to remain competitive in the industry or on how much of that relief should come from the Union.[17] The Union

---

substantial loss, and not experience a cash flow problem over the short term. While either a cash flow problem or operating losses may be appropriate reasons for interim relief, Royal has consistently emphasized that its problem is operating losses. See Code § 1113(e) (Interim relief can be granted "if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate"). If interim relief were requested *only* because of a cash flow problem, the court would have to consider possible alternative sources of financing available to the debtor before granting the Debtor's request.

14. The Union's counterproposal provided that (a) the work week would be extended from 32–½ hours to 34–½ hours; (b) by mutual consent, workers would have a work week of 4 8-hour shifts, with the same pay as for a 5-day work week of 34–½ hours; (c) delete the BAP Fund payments by requiring the Debtor to pay benefits to persons holding priority in the same manner and amount as they would have been entitled to receive from the BAP Fund; (d) the 3% annual wage increase would be deleted; (e) Royal would be allowed to reduce the wage scale or the annuity fund contributions upon approval of the majority of the chapel by secret ballot vote with one reduction to be a loan with interest at prevailing money market rates repayable from profits with 50% of the loan to be a personal obligation of the owners in the event the firm was closed; and (f) adjust the Welfare Fund and the Negotiated Pension Fund contributions to provide the same amount to the funds that would have been paid if no wage or annuity fund reduction had been made.

15. The Debtor made several amended proposals between March 3 and the start of the rejection trial. Analysis of the differences is not material to the motion.

16. Mr. James Grottola, the Union representative, testified that the Debtor raised priority for the first time at the April 17 meeting. Although this may be the first time Mr. Grottola realized it, the Debtor's rejection application filed on March 19, clearly contains reference to priority and work rule changes. More interestingly, it suggests that prior to April 17 the Union had even less reason for declining to negotiate with Royal since priority was not an issue.

17. It is to be hoped that over time as experience with Code § 1113 is gained that it will become the nonjudicial issue that adequate protection for secured creditors has become, in this district at least, because the parties will resolve the matter through negotiation. At least one possible approach would be for the parties to stipulate to interim relief and agree to delay the hearing on the rejection motion in order to determine whether the stipulated modifications work or should be amended and when and how they would be converted into permanent changes.

raised issues at trial respecting whether the sacrifices were being equitably distributed. For example, at the mid-point of the trial the Union brought out for the first time that Mr. Haberman is on the Debtor's premises only once a month on average.

It is the Union's view that the Debtor escalated its demands after the Chapter 11 filing to include the priority modification requests and refused to withdraw them because the Debtor knew the Union was unequivocably opposed to any change in the priority system. At trial, the Union sought to show that Mr. Haberman was motivated by a desire to create a model union contract.[18] Although Mr. Haberman conceded his interest in a model contract, his main motivation has been the salvage of Royal's future. This court finds that the Debtor did not intentionally sabotage the negotiations by requesting priority changes and that the Debtor sought modifications in good faith which it believed were necessary and to which it believed the Union might and could agree.

In addition to the legislative intent discussed previously, both equity and conservation of judicial resources favor an interpretation of Code § 1113(c) that promotes effective prehearing negotiations. Equity requires it in order to reduce the possibility of variable outcomes resulting from differences in individual judges' points of view on necessity and fairness. Judicial economy requires it in order that trials of these motions do not consume the court's docket. This court does not suggest that it may abdicate its duty to consider the general necessity for and fairness of the Debtor's proposal. The court, however, should not be the primary object of the parties' advocacy. Rather the parties must be encouraged to excell at advocacy in the prehearing negotiation process with the aim of reaching a consensual solution. As the parties refine their prehearing focus, so must the court refine its focus at trial. When a prehearing stalemate results, the court must focus its considerations at trial more finely. In the case of a stonewall, however, when the court turns to the debtor's proposal itself under Code § 1113(c)(1) it must focus on the larger picture: whether the Debtor has shown any necessity for modifications of the magnitude it proposed, whether it made its books and records and any other relevant information on which it based its proposal available to the Union and whether it attempted in good faith to confer with the Union to reach mutually satisfactory modifications. This court finds that Royal has met these burdens.

Royal established at trial it had need for substantial relief under the Union contract and that it had spread the burden of financial sacrifice. A review of the Debtor's financial history shows that the Debtor filed its Chapter 11 petition virtually at the last moment its tangible assets were sufficient to pay its liabilities. Royal's 1985 year end statement reflects a loss of $225,080 on sales of $5,945,215. The 1985 balance sheet shows assets of $2,575,890, of which goodwill is $897,896 or 34.9%.[19] Shareholders' equity is stated to be $561,726.

Goodwill, although a legitimate balance sheet item, does not represent a tangible

18. The Union was at least as motivated by principle. For example, Mr. Powers admitted that he felt morally obligated to uphold the Benefit and Productivity Fund, to which Royal is obligated to contribute an enormous 15.186% of wages, because it was established in the 1975 contract and pays benefits to and promotes the social welfare of Union members who have been laid off.

19. For the year ended December 31, 1982, Royal's audited balance sheet reflects total assets of $2,903,667, of which good will accounted for $946,685, or 32.6%. Shareholders' equity in that year is stated to be $919,481, or less than the amount of the stated good will. Royal's income in 1982 was $6,513,522 and it had an operating loss of $545,236. Royal's audited balance sheet for the year ended December 31, 1983, reflects total assets of $2,642,599, of which good will was $946,685, or 35.8%. Shareholders' equity in 1983 was $1,009,055. On its 1983 sales of $6,237,119, the Debtor's net income was $89,574. In 1984, Royal's year end statement reflects assets of $2,953,318, of which good will accounts for $946,685 or 32.1%. Shareholders' equity was $936,803. On its 1984 sales of $6,804,401, the Debtor lost $72,252.

asset. In Royal's case, the goodwill item reflects the accounting treatment of a 1976 merger. The only liquidation value that can be ascribed to goodwill is the possibility the Debtor's name might have some unknown value. For the three years prior to 1985, goodwill and shareholders' equity were approximately equal. In 1985, however, because of the erosion of shareholders' equity caused by operating losses, goodwill exceeds shareholders' equity by 59.8%. Liabilities exceeded tangible assets at the end of 1985 by $336,170.

The Debtor's liabilities as reflected on its 1985 statement total $2,014,164, comprised of current liabilities (inclusive of the current portion of long term debt) of $1,105,-794, long term debt of $689,620, and subordinated long term debt of $218,750 (or $373,750, if the current portion is included). The long term debt, including the current portion, is secured by the Debtor's accounts receivable, work in process and fixed assets, including equipment.[20]

Royal is plainly in need of financial rehabilitation. Its operations have been unprofitable since the economic slump in 1982 when its sales fell $2 million in one year. Its sales base is eroding, primarily because of Royal's inability to be price competitive. Professor Ralph Gray, Professor of Economics at DePauw University, testified at trial that Royal is an economic anachronism. He caused a survey to be conducted in March 1986 which revealed that type buyers are extremely cost conscious and that the large number of non-union producers has driven prices down to the point where the market price is below the cost per unit of a union shop such as Royal. Professor Gray reviewed the two strategies available to Royal and concluded that Royal lost under either. If Royal meets the market price, it can operate at capacity but it will lose money. If Royal keeps its present prices, volume will drop, and Royal will also lose money. Professor Gray stated that a union shop could compete if it could operate as if it were a non-union shop. Thus Professor Gray concluded that in order to survive Royal must end up with a labor cost that is competitive with a non-union shop's labor cost.

Royal needs to buy new equipment at a cost in excess of $600,000 in the next few years. Since 1982, Royal has tightened its belt in many ways. Non-union management and executive salaries were cut in 1982 and again in 1985. Trade associations memberships were eliminated. When Royal moved its plant in 1985 at the expiration of its former lease, even the doorknobs were taken and reused. Royal's new premises are smaller and the rent is significantly less than that sought by its former landlord for a renewal lease. Union labor cost, Royal's single largest expense, is the only expense that has not been cut in the last four years.[21]

Code § 1113(b)(1)(A) states that the debtor should base its proposal on the most complete and reliable information available at the time the proposal is made. Code § 1113(b)(1)(B) states that the union is to be provided with such relevant information as is necessary to evaluate the proposal. Royal is not a Fortune 500 company. Although it has outside accountants, much of its financial work is done by its own controller, Roberta Basel, as can be expected. Royal commissioned no outside studies by financial consultants before requesting relief from the Union. It had no fancy graphs or trend lines. When Mr. Haberman first met with Mr. Powers in January 1986, Mr. Haberman had but a single sheet

---

**20.** The secured creditors appear to be fully collateralized. There is no reason apparent to this court why a fully secured creditor should have to make any sacrifice before rejection can be permitted. Of course, a creditor who would not be fully secured in the event of liquidation may well be required to make concessions in order to obtain the reorganization-enhanced value of its collateral.

**21.** Royal, as it is permitted under the contract to layoff union workers at its discretion, has laid off union workers during this period. However, for retained union workers, Royal made all payments required by the Union contract prior to the Chapter 11 filing, including payments which were required to "retrain" laid off workers in other job classifications at Royal.

of paper on which were listed some of the Union costs for 1985, being as follows:

| | |
|---|---|
| "Annuity (13%) | $272,485 |
| Welfare Fund (8.9765) | 183,326 |
| Benefit & Productivity Fund (15.186%) | 278,364 |
| Pension Fund (5.9851%) | 122,196 |
| Five extra men (caused by "priority" rules), daily hiring charges, training | 300,000 |
| TOTAL | $1,156,217 |

"Still to come: the impact of four week vacation, double overtime, 6–¼ hour shifts, *extra-ordinary* work rules ...

Clearly we are talking about more than $1,500,000."

Across the bottom of this typewritten page, the audited sales and loss figures for 1984 and 1985 had been handwritten. This was reliable and relevant information and complete enough to form a basis for reasoned consideration of Royal's proposal. Thereafter, Royal provided supplemental information and permitted the Union's accountant full access to its books and records. The accountant choose to make only two short visits to Royal's premises.

By letter dated April 18, 1986, the Union sent Royal an information request of nine detailed items purportedly required to evaluate Royal's proposal. Some of the items sought information about the basis of Royal's projections of future operations. Others sought itemization of Royal's estimates of the cost savings which would be derived from each of its proposals. None of this information had been previously requested of the Debtor by the Union's accountant. At trial, the accountant testified that he had not advised the Union that it should request the information sought in the April 18 letter.[22]

The Union had no difficulty in connection with the hearing on the Debtor's request for interim relief on March 21, 1986 in evaluating the dollar effect of the request relative to the four benefit funds. A union must be assumed to understand the economics of its own contract relative to its members as that is fundamental to the union's role as bargaining agent for the members. The failure of the Union to request the information during the three months following Royal's request for relief reflects that the information was not fundamental to its ability to evaluate Royal's proposal.

The Union's belated request was simply part of its tactics relative to the rejection motion.[23] In the real world, the basic economics of Royal's situation and proposal could be calculated on the back of the proverbial envelope. This case called for an overview type of economic analysis. For example, in light of the testimony that the Debtor's prices are 15–20% higher than its non-union competitors, one could approach the question of determining the extent to which costs must be reduced by considering the effect of a 15% price reduction. On sales of $4,750,000 that would be $712,500. The amount of subsidiary information and refinements which could be provided or made is endless. Finetuning of the Debtor's projections can only occur through discussion, particularly that which accompanies the bargaining process. Indeed, the Union appears to have recognized this Debtor's need for relief as long ago as

---

**22.** At the time that it received the Union's letter, the Debtor did not have all of the information sought in the form requested. In particular, the Debtor did not have detailed schedules of the projected wages and fringe benefits for Union workers broken down as requested. The Debtor hired George Robbins, a consultant to the graphic arts industry, to prepare the requested schedules following receipt of the Union's letter. By letter dated May 1, 1986, the Debtor supplied to the Union the information requested in its April 18, letter, including detailed schedules prepared by Mr. Robbins. Mr. Robbins stated at trial that the preparation of the schedules had been a fairly simple task on his personal computer using a standard spread sheet program.

**23.** The Union's follow-up letter of April 30 to Royal's attorney self-servingly states:

"It appears from Royal's refusal to so provide the requested information, that it has no intention of discussing this matter further with us in a way which will allow us to intelligently evaluate Royal's position."

The April 30 letter was mailed and not received by the attorney until May 2, the day after Royal delivered the requested information by hand to the Union.

1984 because at that time it unsuccessfully sought certain modifications in the Union contract from The Printers' League on Royal's behalf.

At trial the Union representative pointed to the Debtor's differing responses at various times to how much it expected its losses to be. Projections are necessarily approximations and will differ depending on the different assumptions made. Here, the Debtor's projections developed and changed over a period of time based on refinements and new information. For example, only during the week of April 28 did Royal learn that it would lose a customer accounting for $400,000 of sales in 1985. The Debtor's projections did not include any provisions for funding either a plan of reorganization or the purchase of new equipment required to keep pace with technological changes.

At trial the Union through its accountant attempted to show that the Debtor's projections were much too gloomy by means of taking the Debtor's historical cost ratios for the last three years and applying them to the Debtor's projected sales. This mechanical manipulation resulted in projected losses for 1987 of $34,204, 1988 of $79,600 and 1989 of $120,108 as compared to the Debtor's projected losses of $1,409,850 in each of 1987 and 1988 and $1,794,600 in 1989.

At trial, Ms. Basel offered cogent explanations of why the Debtor's projections differ from the historical cost ratio analysis offered by the Union accountant. Ms. Basel discussed her projections at length. Of great importance to her projection is the labor to sales ratio. In 1984 that ratio ranged from 51.2% in the first quarter, historically Royal's best quarter, to 55.81% in the fourth quarter. In 1985, the ratios ranged from a first quarter 48.58% to a fourth quarter 58.75%. Ms. Basel predicts that the labor to sales ratio will rise to 59% in 1986 and up to 78% in 1989. Reduction in the labor to sales ratio would reduce the projected losses.

Ms. Basel's projections are based on current prices and a 10% sales decrease per annum. Although no projections were offered based on Professor Gray' alternative strategy of reduced prices, it is evident that in such projections labor costs would also have to be reduced by increases in productivity or decreases in price or a combination of these.

The saving sought by the Debtor under the Union contract aggregate $868,023 for the balance of 1986, $1,175,754 for 1987, $1,150,879 for 1988 and $806,122 for the first nine months of 1989. Comparison of the proposed savings with projected losses reflects that the savings are less than the losses. The order of magnitude of the Debtor's request to the Union was appropriate.

The Union's analysis of the Debtor's financial position at trial remained that set forth in a letter dated May 20, 1985 to the BAP Fund from Herman Volk and Co., accountants for the Fund. That letter,[24] which was seen by the Debtor for the first time during the trial, concluded that the

**24.** In its entirety, the letter reads:

"The financial statements of Royal Composing Room, Inc. reflect net loss for the year 1984 of $62,252 and net income for the year 1983 in the amount of $111,674. The loss for 1984 is the result of a buy out of a stockholder with the payment of $75,000 in severance pay and $61,250 for a noncompete provision, both of which are not recurring.

"The sales for the year 1984 were $6,798,311 as compared to the year 1983 sales of $6,173,-741, an increase of $624,570.

"The company has been purchasing the shares of stock of various stockholders for a number of years with various costs applied to the operations. As of May 20, 1985, the re-

maining officers are Mr. Daniel Haberman and Mr. Edwin Horn. The payments of interest to past shareholders in 1984 was $34,295 and for 1983 $52,084, which amounts were included in operating expenses.

"The company financial statements do not reflect recurring operating losses. The balance sheet states that the accounts receivable have substantially increased, while the cash position has remained the same.

"It is therefore our opinion, that Royal Composing Room, Inc. is operating on a profitable basis, and the request for employer subsidies should be denied at the present time."

Debtor was not experiencing recurring operating losses and was operating on a profitable basis. The accountant reached this conclusion by excluding payments to former shareholders from operating expenses. Similar payments were made to former shareholders in 1985. In addition, moving expenses were incurred in 1985. The moving expenses are likewise not recurring operating expenses, but they still must be reckoned with as a legitimate and necessary corporate expense. The Union did not discuss the details of its economic analysis with the Debtor during the prehearing negotiations.

Mr. Haberman, when taxed with questions for the first time at trial about the propriety of the payments to the former shareholders, stated that in his judgment that the payments were legitimate corporate expenses. A number of the payment arrangements were made in lieu of the terms of existing contracts by which Royal was bound. He further stated that deferments of various payments to former shareholders had been obtained in 1983 and at other times. As to the payments to Mr. Jack Gabow, Mr. Haberman stated that they were for a non-competition agreement pursuant to which Mr. Gabow left his sales with Royal and that it was important to Royal to have the sales. Mr. Haberman was of the view that it was inappropriate for him to request any further concessions from these individuals.

This court does not find the Debtor's views on the shareholder payment issue unreasonable.[25] In any event, the former shareholder payments are irrelevant to Royal's projections since no payments to the former shareholders were included in the expense items. The Debtor has not proposed a plan of reorganization yet and what its ultimate treatment for these persons might be is speculative. In light of the subordinated nature of much of these obligations and of the insufficiency of tangible assets discussed above, these per-

sons' prospects for a 100% distribution under a plan seem far from certain. In all events, a 100% distribution would appear to be possible only in the form of a long-term pay-out.

The second major point about the equities of sacrifice made by the Union for the first time at trial is the level of executive compensation. Mr. Haberman's salary is $200,000 per year. Edwin Horn, the other shareholder and executive, has an annual salary of $235,000. In addition, Mr. Horn is reimbursed entertainment and other expenses of in excess of $50,000 per year. In 1982, Messrs. Horn and Haberman each received $300,000. In 1983, each of them took a 50% pay cut, or $150,000 as part of a package of expense reductions totalling $825,420. At that time, a Mr. Minson was still a shareholder and executive of Royal and also received $150,000 per year. Mr. Minson was forced to retire during late 1984. The aggregate received by Messrs. Horn, Haberman and Minson in 1984 was $435,000. Upon Mr. Minson's retirement, Messrs. Horn and Haberman increased their compensation to $235,000 and $200,-000, respectively, thus partially restoring the 1983 reductions.

Mr. Horn is Royal's chief salesman. He is responsible for the production of the bulk of Royal's sales, which are to the nation's leading advertising agencies. Royal has three other salaried salespersons, whose salaries range from $65,000 to over $100,000. In the past Royal has had commissioned salesmen. These persons left to join non-unionized typography shops whose growth potential and competitive position was better due to lower product prices, and who therefore offered greater commission potential. Mr. Horn's contacts in the advertising industry and proven sales record indicate that it is reasonable to believe he could secure other employment and receive a commission of 10–15%. That would amount to over $400,000 per annum,

---

**25.** The payments to former shareholders conferred a personal benefit on Messrs. Horn and Haberman because they each became 50% shareholders through the payments. Mr. Ha-

berman stated at trial that in his view the stock was worthless and that the payments to the various former stockholders were made to keep Royal alive.

an amount significantly in excess of his present salary. Although high, Mr. Horn's expenses are necessary for the production of business. Mr. Horn's personal social life revolves around his business clients. It appears to the court that it is Mr. Horn's personal and life-long contacts with persons in the largest advertising agencies in the United States which has allowed Royal to continue over the last few years against the odds. Indeed, Mr. Haberman expressed the view that he wished Mr. Horn would even spend more on entertainment than he does now.

Mr. Haberman is responsible for all areas other than sales. In 1985, Mr. Haberman was responsible for coordinating, planning and executing Royal's move from its existing premises on which the lease was expiring to its present space. He also did the architectural and design work. He speaks to Ms. Basel, Royal's controller, five to seven times a day by telephone. He speaks to Mr. Horn at least a few times a week by telephone. Mr. Horn depends on Mr. Haberman to handle the operational side of the business. Mr. Horn regards Mr. Haberman's advice about handling sales problems as invaluable. Mr. Haberman provides long-range planning for Royal. He goes to Royal's premises approximately once a month, although he went there more frequently while planning for the move was in progress. No testimony was introduced that Royal, whose work is principally performed at night, was poorly managed.

A witness for the Union testified that executive salaries at certain non-union shops were less than $100,000 per annum. During late 1985, Messrs. Horn and Haberman took a pay cut in the form of a compensation deferral of 21% and 26%, respectively. Whether Mr. Haberman's compensation is reasonable for the services he renders is a matter of judgment on which reasonable people could differ.[26] This court cannot find the Debtor's failure to

make additional executive compensation reductions beyond those made in 1982, and partially restored in late 1984, and then partially deferred in late 1985, as part of its proposal to be unreasonable in the absence of any prehearing articulation by the Union that executive compensation levels were too high or should be reduced. Moreover, even significant cuts in executive compensation would not have given Royal economic relief on the order of magnitude required for its survival.

Many of the Debtor's proposed modifications in the Union contract dealt with enhancing flexibility in labor utilization and represented possible opportunities for financial cost-free concessions by the Union. For example, the Debtor sought to be permitted to allow its union employees at their option to take one-day vacations on Friday in the summer, a practice presently prohibited by the Union contract, because many of the Debtor's clients close for a half or whole day on Fridays in the summer. The Union refused to agree to this proposal. Certainly some of Royal's workers would like the opportunity to have at least some three-day weekends during the summer. While it is possible to conjure up abuses by the employer or employee of a one-day vacation provision, the basic concept is one that is at least as pro-employee as it is pro-employer. Likewise, the Debtor sought substitution of certain holidays because the contract holiday schedule is not coordinated with that of the Debtor's clients. The Union again declined to agree and pointed out at trial that as a matter of practice an employer desiring to substitute holidays must give employees 2 days for 1.

The Debtor also sought changes in certain work rules, such as starting times, tied to priority. Again in concept the changes are not inherently unreasonable. The Debtor will in the future be faced with enormous competitive pressure which will require it to have maximum flexibility, in-

---

**26.** Ms. Basel, who took a pay cut in 1985, deals closely with Mr. Haberman. Although not directly questioned on the issue at trial, Ms. Basel's demeanor at trial never suggested that she harbored any sense of grievance at either Mr. Horn's or Mr. Haberman's level of compensation or thought them inappropriate.

cluding with respect to utilization of its unionized labor, in order to mold and adapt in a changing business environment.

The Union has questioned the need for any alteration of existing priority, or seniority, rules. The court is persuaded that a proposal providing for some intrusion on the priority system was not inherently unreasonable. The Debtor's unionized work force has declined from over 130 to 31 in recent years. The Debtor has been forced to lay off a number of what it views as its most competent workers because layoffs must be made in strict order of seniority. A reduction in scale of this size made on a strict seniority basis is unlikely to produce the same work force that layoffs made on a merit basis would produce. Of the eleven employees in the compositor classification, none was hired after 1965. In the operator class, all but two have dates of hire in or prior to 1968. The Debtor's most competent operator was hired in 1976 and is exempt from seniority layoff as long as she does training and supervisory work only and does not perform operator class work herself.

The Union points to provisions of the contract that allow workers to be discharged for incompetency. The Debtor's response is that in reality it would be unsuccessful if it sought to discharge workers for incompetency. It is unimportant whether the Union or the Debtor is correct since this dispute merely reinforces the need for prehearing negotations at which these issues could be thrashed out.

There are a number of possible solutions to the priority issues. The Union could, for example, have proposed that employees could be laid off out of turn only if they received a lump sum severance payment. During the trial, the Debtor proposed that it be authorized to discharge up to five workers without regard to seniority.

Having reviewed the facts, the court will turn again to the Third Circuit's decision in the Wheeling-Pittsburgh case. The meaning of "necessary" as used in Code § 1113(b)(1)(A) and incorporated by reference in Code § 1113(c)(1) is the central focus of the Third Circuit's decision, the first Court of Appeals decision to consider Code § 1113. The court found that there were two aspects to a court's inquiry into necessity: (1) the standard to be applied, i.e., "how necessary" must the proposed modifications be, and (2) the object of the "necessary" inquiry, i.e., "necessary to what."

The Third Circuit found that the emphasis in "necessary to what" was "on the reorganization, rather than the longer term issue of the debtor's ultimate future." Slip Opinion at 32. Here there appears to be no meaningful distinction between reorganization and Royal's ultimate future. If Royal can reorganize by lowering its union labor costs, it has a future; if it cannot, it does not. Moreover, reorganization requires that the future be considered because in order to confirm a Chapter 11 plan the court must find

"Confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." Bankruptcy Code § 1129(a)(11).

As to how necessary, the Third Circuit found:

"The congressional consensus that the 'necessary' language was substantially the same as the phrasing in Senator Packwood's amendment, which looked to the 'minimum modifications * * * that would permit the reorganization,' requires that 'necessity' be construed strictly to signify only modifications that the trustee is constrained to accept because they are directly related to the Company's financial condition and its reorganization. We reject the hyper-technical argument that 'necessary' and 'essential' have different meanings because they are in different subsections. The words are synonymous." Slip Opinion at 31–32.

■ This court finds no synonymity in the terms. Essential is used in Code § 1113(e) in connection with interim relief. It is only proper that interim relief, which

can be viewed as a type of preliminary or provisional remedy, should be limited to the bare minimum, or essential, requirements of the Debtor, particularly as it will frequently be necessary to consider interim relief before the debtor's proposal can be refined through the negotiation process. However, the final modifications, dealing as they must with the uncertainties created by a longer period of time and the larger picture of a debtor's reorganization and economic future and considered after the parties have an adequate opportunity for negotiation, neither can nor should be so finely tuned to bare survival. Therefore, the standard is that the modifications be necessary. A debtor can live on water alone for a short time but over the long haul it needs food to sustain itself and retain its vigor.

█ The Union urges that the Third Circuit would find Royal's proposal was not necessary or essential.[27] That may be. However, this court finds that Royal established its need for relief on the order of magnitude requested was necessary to Royal's economic survival. It established that it had in good faith attempted to negotiate for necessary changes but had been unsuccessful because of the Union's unwillingness to engage in serious discussions. This court urged the parties to negotiate beginning with the interim relief hearing and continuing even during the trial to no avail. Royal established that the balance of the equities favored rejection in order that Royal might have an economic future. Both of Royal's experts opined that Royal's proposal was essential to its future surviv-

al.[28] This court is satisfied that this Debtor has done the best that can be expected of it under all the circumstances and that no greater showing of necessity can be expected before rejection of the collective bargaining agreement should be permitted.

The court finding that the requirements of § 1113(c) have been met, Debtor's application for rejection is hereby granted.

It is so ordered.

---

27. There are a number of important factual distinctions between Wheeling-Pittsburgh and this case. In Wheeling-Pittsburgh the court was confronted with a motion for rejection by a large company seeking an actual wage reduction in which the bargaining process was advanced at the time of the hearing, and in which the hearing was held only a few weeks after the case was filed and in which no interim relief was requested. Royal is not a large company, it has consciously avoided requesting a wage reduction and seeks only the elimination of benefit fund obligations, the bargaining process had progressed little, if at all, over the almost two

months before the hearing commenced, and interim relief had been requested and granted.

28. Mr. Robbins, who for many years was employed by the umbrella organization of which the Printer's League is part and who has extensive familiarity with cost analysis under the contract, opined as follows:
 "Q. Have you formed any conclusions with respect to the proposal?
 "A. I have reached the conclusion that unless the proposal is enacted, Royal Composing Room cannot survive." Transcript 5/13/86 at 141.