GEORGE C. PRATT, Circuit Judge:
For the second time in a year we are called upon to interpret § 1113 of the bankruptcy code, 11 U.S.C. § 1113 (1987 West Supp.), and the circumstances under which a debtor may reject a collective bargaining agreement as part of its reorganization. As in Truck Drivers Local 807 v. Carey Transportation, 816 F.2d 82 (2d Cir.1987), we affirm the judgment of the district court, which upheld the bankruptcy court’s determination that the debtor, Royal Composing Room, Inc. (“Royal”), had met the requirements of § 1113 and granted Royal’s application to reject its agreement with New York Typographical Union Local No. 6 (“the union”).
BACKGROUND
Over the last 10 years, there have been enormous changes in the printing industry. The traditional method of printing with li-notype machines has been replaced by faster, cheaper methods of computer printing that have revolutionized the market.
As with most technological innovations, those in the printing industry created opportunities for some and dilemmas for others. One of those facing difficult choices was Royal, which had been a leader in the specialized field of advertising typography.
Foremost among these choices was what to do about its relatively high labor costs. Royal was faced with a unionized work force in an industry wherein its new competitors were not unionized, resulting in Royal being unable effectively to meet the market price for its product. As the bankruptcy court noted, “Royal * * * is one of the last unionized advertising typography shops in New York City.” In re Royal Composing Room, Inc., 62 B.R. 403, 404 (Bkrtcy.S.D.N.Y.1986). The problem was exacerbated by seniority rules — known in the industry as “priority” — which obligated Royal to retain its most senior employees, even though they were trained on and most qualified for the now-outdated linotype machines.
These pressures caused a gradual deterioration in Royal’s financial condition. From 1976 to 1985, its gross receipts declined from $7.8 million to $5.9 million; after posting a profit in every year between 1976 and 1981 except one, it has lost money every year since 1982. As the.bankruptcy court found, when Royal filed its chapter 11 petition on March 14, 1986, it was “virtually at the last moment its tangible assets were sufficient to pay its liabilities.” Royal Composing Room, 62 B.R. at 411. The court went on to sum up Royal’s problems:
Royal is an economic anachronism. * * * [A] survey [was] conducted in March 1986 which revealed that type buyers are extremely cost conscious and that the large number of non-union producers has driven prices down to the *347 point where the market price is below the cost per unit of a union shop such as Royal. * * * If Royal meets the market price, it can operate at capacity but it will lose money. If Royal keeps its present prices, volume will drop, and Royal will also lose money.
Id. at 412 (summarizing and accepting testimony of Dr. Ralph Gray).
Based on these difficulties, and similarly dismal projections of future losses, Royal in 1985 began to seek concessions from the union. See id. at 408. For reasons disputed by the parties, the union was unwilling to grant any relief to Royal, leading the company to file its bankruptcy petition in March, 1986.
Under § 1113 of the bankruptcy code, a debtor must make a proposal to the union before it applies to the bankruptcy court to reject a collective bargaining agreement. The proposal must be limited to “those necessary modifications in the employees’ benefits and protections that are necessary to permit the reorganization of the debtor * * 11 U.S.C. § 1113(b)(1)(A). Royal made its prerejection proposal on March 18, 1986.
From that date through May 8, the parties engaged in limited negotiations, characterized by what Judge Abram termed “a stonewall” position adopted by the union. Royal Composing Room, 62 B.R. at 408. The union made only one counter-proposal, that coming on May 5, at the final pretrial conference. As to that proposal, the bankruptcy court found that it “provided significantly less economic relief to the Debtor than the interim relief which had been granted on March 21 * * Id. at 410. Between March 18 and May 8, there were only two short negotiating sessions, and the blame for the lack of a real effort to reach an accommodation was laid squarely upon the union by Judge Abram. Id. at 409 (“The Debtor was continuously available for and sought meetings. * * * At no time prior to May 5, did the union make a counter-proposal, comment item by item on the Debtor’s financial situation, or state any reasons why it found the Debtor’s request to be unfair or inequitable.” (footnote omitted)).
Trial commenced on May 8. The union concentrated its efforts on demonstrating that Royal did not require the savings it had sought in its March 18 proposal, and therefore that the proposal was not limited to “necessary modifications” to the agreement.
The bankruptcy court, however, concluded that Royal’s proposal was necessary to its successful reorganization, thereby clearing the threshold requirement for obtaining approval to reject its union contract. The court reasoned that where the union rejects the debtor’s proposal without good cause, and does not engage in good faith negotiations toward a compromise, and the “debt- or is in need of substantial relief”, 62 B.R. at 408, the case for rejection of the contract is at its strongest, under the “balance of the equities” test contained in § 1113. 11 U.S.C. § 1113(c)(3).
The bankruptcy court went on to evaluate the debtor’s need for relief of the scope represented by its proposal, finding that the charges were not “inherently unreasonable” and concluding that Royal’s recent history of lost business and operating losses, combined with bleak projections about its future, made plain “that Royal established its need for relief on the order of magnitude” contained in its proposal. Id. at 418. Despite the somewhat inartful phrasing, the conclusion that the proposal was limited to necessary modifications is clear, and the court granted Royal’s application to reject its union contract. The district court affirmed, 78 B.R. 671, and this appeal followed.
DISCUSSION
On appeal, the union has narrowed the focus of its attack on Royal’s proposal. It now contends that Royal failed to show the necessity for eliminating priority. The union implicitly argues that if any single vital element of the proposal — such as the elimination of priority — cannot be shown to be necessary within the meaning of § 1113, the entire proposal cannot be deemed “necessary”, and rejection of the contract must *348 be denied. We reject the union’s argument on two grounds. First, we disagree with its reading of § 1113, and hold that, at least in these circumstances, the focus should he on the proposal as a whole. Second, the bankruptcy court’s conclusion that Royal had, in fact, shown the necessity for eliminating priority amply is supported by the record and therefore is not clearly erroneous.
I. The Meaning of “Necessary” in § 1113.
The term “necessary” appears twice in § 1113. It requires the pre-rejection proposal to contain only “necessary modifications”, and that the proposal be “necessary to permit the reorganization of the debtor.” 11 U.S.C. § 1113(b)(1)(A). We have interpreted the necessity requirement of § 1113 as placing upon a debtor “the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully.” Carey Transportation, 816 F.2d at 90 (emphasis added). That the approach followed by the bankruptcy court below was consistent with the one later adopted by this court in Carey Transportation is at least indicated by the fact that Judge Altimari’s opinion quotes, fairly extensively and approvingly, from Judge Abram’s opinion in the instant case. See id. at 89-90.
This conclusion is buttressed by the general inconsistency between holding, as we did in Carey Transportation, that the debtor’s proposal need not be limited to “absolutely minimal” modifications, and holding, as the union would now have us do, that each and every vital element of the debtor’s proposal must be shown independently to be necessary. At the least, focusing on a particular element vital to the proposal when the union does not bargain to change that element, rather than on the necessity for the package taken in toto, would undermine the interpretation of § 1113 articulated in Carey Transportation.
At first blush, there seems to be some merit to the union’s contention. If a particular element of the debtor’s proposal is not needed, the proposal would seem not to be limited to necessary modifications — by definition, it would include an unnecessary modification.
Under that tautological reading of the statute, however, no proposal could ever truly be “necessary”, since any single vital element of a proposal can hardly be “necessary” if it can be replaced by some alternative not included in the package which would achieve the same dollar savings for the debtor. Or, the union, as here, could argue that a specific element could substantially be modified, rather than eliminated, to achieve virtually the same savings and the same likelihood of a successful reorganization. In other words, the union’s construction of the statute would enable it to play “hit-and-run”: refusing to negotiate toward a compromise, safe in the knowledge that it will almost certainly be able to defeat a rejection application by attacking some vital modification by saying that it cannot be “necessary” if reasonable substitutes could have been offered. See Royal Composing Room, 62 B.R. at 407 (“[T]he rejection process becomes a game of Russian roulette in which the union will stand mute during negotiations in the expectation that the court is apt to find some aspect of the debtor’s proposal unnecessary * * *.).
This is not to say that the union is always necessarily bound by the particular elements chosen by the debtor. If the debtor proposes an element objectionable to the union, the union has two options under § 1113. It can argue that the part of the proposal it cannot accept was included by the employer in bad faith, in an effort to stalemate negotiations and allow it to obtain outright rejection rather than a negotiated compromise. If the union can make such a showing, the debtor would not be entitled to reject the labor contract under Carey Transportation, 816 F.2d at 90. The union attempted here to make such a showing in the bankruptcy court, see Royal Composing Room, 62 B.R. at 411, but the court explicitly rejected the argument, and *349 the union does not challenge this finding as clearly erroneous.
Alternatively, the union can negotiate with the debtor. Although this is plainly what congress was seeking to encourage when it passed § 1113, see id. at 405-06 (reviewing legislative history); In re Mile Hi Systems, Inc., 51 B.R. 509 (Bkrtcy.Colo.1985), rev’d on other grounds, 67 B.R. 114 (D.Colo.1986), it is apparent from Judge Abram’s opinion below that this alternative was for some reason unacceptable to Local 607. If the union believes that a vital part of the proposal is unacceptable, it should enter into good faith negotiations aimed at moderating that element, or at substituting a measure less offensive to the union but achieving comparable savings for the debt- or.
But, in this case, the union refused even to discuss the issue. Not only did the union take the position that priority was nonnegotiable; it went still further and refused to negotiate at all until priority was taken out of Royal’s proposal. Id. at 410.
A union certainly is entitled to adopt a hard-line position, but if, as in this case, the union does so, it must recognize the risk inherent in the strategy. The balance of the equities nearly always will tip in favor of the party that seeks to reach a compromise and to that end negotiates in good faith. 11 U.S.C. § 1113(c)(3). This is particularly true where, as here, the debtor not only seeks to negotiate in good faith, but also has adopted numerous cost-saving measures to try to improve the situation before declaring bankruptcy and seeking concessions from the union. See Royal Composing Room, 62 B.R. at 412 (“Union labor cost, Royal’s single largest expense, is the only expense that has not been cut in the last four years.”); In re Royal Composing Room, 78 B.R. 671, 672 (S.D.N.Y.1987) (“As of the end of 1985, Local 6 had not yet made any sacrifices or concessions.”). Cf. In re Kentucky Truck Sales, 52 B.R. 797, 799 (Bkrtcy.W.D.Ky.1985) (crediting as important testimony that “the debtor has already made nearly all possible cost cuts in the nonlabor areas of its operation”). Moreover, the rejection of the proposal by the union in such circumstances will almost always without exception be without good cause, another prerequisite to the debtor obtaining rejection of the contract. 11 U.S.C. § 1113(c)(2).
Put simply, where a union refuses to negotiate in order to obtain a different combination of modifications, it may not challenge the particular combination, or any vital element, contained in the debtor’s proposal. So long as the total quantum of savings is necessary under the Carey Transportation standard, the union may not prevent rejection by belatedly attacking a specific element.
In terms of § 1113, the burden on the parties to negotiate is best analyzed under § 1113(c)(2), which permits rejection of the agreement only if the union has rejected the debtor’s proposal without good cause. If the union seeks to negotiate compromises that meet its needs while preserving the debtor’s required savings, it would be unlikely that its rejection of the proposal could be found to be lacking good cause. If, on the other hand, the union refuses to compromise, it is as unlikely it could be found to have acted with good cause.
Thus, the union here must stand or fall on the overall necessity of Royal’s proposal. There is, however, no doubt that the district court’s finding that Royal requires the full measure of savings represented in its proposal — and perhaps more— is not clearly erroneous. The total savings projected by Royal from its pre-rejection proposal was $4,000,778, for the years 1986-1989. See Royal Composing Room, 62 B.R. at 414. This amount was less than its projected losses operating under the union contract. Id. It may be true that the same goal might have been reached via a different route, had the union been willing to point the way it preferred. But Royal’s chosen route was found to have been offered in good faith, and to cover the necessary, if not absolutely minimal, distance Royal had to travel. No more is necessary to justify rejection under § 1113, as interpreted by Carey Transportation.
II. The Necessity of Eliminating Priority.
Even if we were to view the proper focus to be on the single element of eliminating *350 priority, we would conclude that Royal demonstrated that it was a “necessary modification” as that term was defined in Carey Transportation. The bankruptcy court did not make an explicit finding as to the necessity for eliminating priority; nevertheless, such a finding is implicit in Judge Abram’s opinion, and fully is supported by the record.
One of the major difficulties facing Royal was the relative inflexibility it had in utilizing its work force. The company had reached the point where it was employing more workers than it needed or could afford, but it could ill afford to lay off workers because, under the union contract’s priority system, it would have had to lay off its most junior workers. Unlike the ordinary situation, where one could expect the most senior workers — those with the greatest experience — to be the most productive, Royal was in exactly the opposite position. Its senior personnel were least proficient on the computer machinery that has taken over the industry, and to compete Royal needed to retain employees who lacked seniority but were most efficient on the latest equipment. See id. at 417.
Thus, as the bankruptcy court held, “[I]n concept, the changes [in priority] are not inherently unreasonable.” The union strenuously argues that concluding that priority changes are “not inherently unreasonable” is insufficient to justify the proposal, because it is far short of “necessary”. This may well be true, but we view the bankruptcy court’s statement as a natural response to the union’s position that any changes at all in priority were unacceptable. Thus, the bankruptcy court began with the conclusion that priority was not off-limits, because changes in priority “are not inherently unreasonable.”
But the bankruptcy court did not stop there. It went on to explain the need to eliminate, rather than merely modify, priority, in terms of Royal’s need for flexibility in assignments and lay-offs. Judge Abram wrote, “The Debtor will in the future be faced with enormous competitive pressure which will require it to have maximum flexibility, including with respect to utilization of its unionized labor, in order to mold and adapt in a changing business environment.” Id. at 416-17.
The union urges that Royal showed only a need for a short-term intrusion into priority, and to depart only on its current layoffs to result in a work force that would achieve the savings Royal said it expected from completely eliminating priority.
There are two flaws in this argument. First, it ignores Royal’s need for long-term flexibility in order to have a truly successful reorganization, one that results in a healthy company emerging from the process. A debtor’s proposal need not be limited to the bare bones relief that will keep it going. See Carey Transportation, 816 F.2d at 89 (“[I]t becomes impossible to weigh necessity as to reorganization without looking into the debtor’s ultimate future and estimating what the debtor needs to attain financial health.”); Royal Composing Room, 62 B.R. at 418 (“A debtor can live on water alone for a short time but over the long haul it needs food to sustain itself and retain its vigor.”).
Second, it is to be expected that Royal would demonstrate the difficulties with priority by showing its current need to depart from priority. This does not mean, however, that the showing supports only the necessity of the currently proposed layoffs. As Judge Abram noted, “Projections are necessarily speculations about the future and are an art, rather than a science.” Id. at 407. We will not hold Royal to show the necessity of every conceivable future use of the flexibility it now requires; it is enough that the bankruptcy court found it needs that flexibility. In an industry where rapid change has been the rule, and where the current need for intrusion into priority is well-established, the implicit finding of a general need to escape from the priority provision to help assure the future health of the company is not clearly erroneous.
CONCLUSION
In short, Royal has shown a need for the level of savings it sought to achieve in its *351 pre-rejection proposal. At least where the union has refused to bargain over particular elements of the proposal, it cannot attack any specific element in seeking to show the proposal is not “necessary”. Here, in any event, the need for eliminating priority adequately was established and the bankruptcy court’s factual findings support the conclusion that the proposal was limited to “necessary modifications”, thus justifying rejection of Royal’s contract with Local 607. We can only hope that the parties will now sit down and negotiate in good faith to reach a new agreement to replace the rejected contract, and reconcile the needs of company and workers alike in an industry where both sides are faced with dramatic, and often painful, changes.
The judgment of the district court is affirmed.