848 F.2d 345
 128 L.R.R.M. (BNA) 2569, 109 Lab.Cas. P 10,544,
17 Bankr.Ct.Dec. 1257, Bankr. L. Rep. P 72,326
 In re ROYAL COMPOSING ROOM, INC., Debtor.
NEW YORK TYPOGRAPHICAL UNION NO. 6, Plaintiff-Appellant,
v.
ROYAL COMPOSING ROOM, INC., Defendant-Appellee.
 No. 779, Docket 87-5043.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 22, 1988.
Decided May 27, 1988.
 
 Daniel Engelstein, New York City (Stuart E. Bauchner, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, David Silberman, AFL-CIO, Washington, D.C., of counsel), for plaintiff-appellant.
 Michael D. Hess, New York City (Marjorie L. Cohen, Owen C. Pell, Brian G. Hart, White & Case, New York City, of counsel), for defendant-appellee.
 Before FEINBERG, Chief Judge, PRATT, Circuit Judge, and McLAUGHLIN, District Judge for the Eastern District of New York, sitting by designation.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 For the second time in a year we are called upon to interpret Sec. 1113 of the bankruptcy code, 11 U.S.C. Sec. 1113 (1987 West Supp.), and the circumstances under which a debtor may reject a collective bargaining agreement as part of its reorganization. As in Truck Drivers Local 807 v. Carey Transportation, 816 F.2d 82 (2d Cir.1987), we affirm the judgment of the district court, which upheld the bankruptcy court's determination that the debtor, Royal Composing Room, Inc. ("Royal"), had met the requirements of Sec. 1113 and granted Royal's application to reject its agreement with New York Typographical Union Local No. 6 ("the union").
 
 BACKGROUND
 
 2
 Over the last 10 years, there have been enormous changes in the printing industry. The traditional method of printing with linotype machines has been replaced by faster, cheaper methods of computer printing that have revolutionized the market.
 
 
 3
 As with most technological innovations, those in the printing industry created opportunities for some and dilemmas for others. One of those facing difficult choices was Royal, which had been a leader in the specialized field of advertising typography.
 
 
 4
 Foremost among these choices was what to do about its relatively high labor costs. Royal was faced with a unionized work force in an industry wherein its new competitors were not unionized, resulting in Royal being unable effectively to meet the market price for its product. As the bankruptcy court noted, "Royal * * * is one of the last unionized advertising typography shops in New York City." In re Royal Composing Room, Inc., 62 B.R. 403, 404 (Bkrtcy.S.D.N.Y.1986). The problem was exacerbated by seniority rules--known in the industry as "priority"--which obligated Royal to retain its most senior employees, even though they were trained on and most qualified for the now-outdated linotype machines.
 
 
 5
 These pressures caused a gradual deterioration in Royal's financial condition. From 1976 to 1985, its gross receipts declined from $7.8 million to $5.9 million; after posting a profit in every year between 1976 and 1981 except one, it has lost money every year since 1982. As the bankruptcy court found, when Royal filed its chapter 11 petition on March 14, 1986, it was "virtually at the last moment its tangible assets were sufficient to pay its liabilities." Royal Composing Room, 62 B.R. at 411. The court went on to sum up Royal's problems:
 
 
 6
 Royal is an economic anachronism. * * * [A] survey [was] conducted in March 1986 which revealed that type buyers are extremely cost conscious and that the large number of non-union producers has driven prices down to the point where the market price is below the cost per unit of a union shop such as Royal. * * * If Royal meets the market price, it can operate at capacity but it will lose money. If Royal keeps its present prices, volume will drop, and Royal will also lose money.
 
 
 7
 Id. at 412 (summarizing and accepting testimony of Dr. Ralph Gray).
 
 
 8
 Based on these difficulties, and similarly dismal projections of future losses, Royal in 1985 began to seek concessions from the union. See id. at 408. For reasons disputed by the parties, the union was unwilling to grant any relief to Royal, leading the company to file its bankruptcy petition in March, 1986.
 
 
 9
 Under Sec. 1113 of the bankruptcy code, a debtor must make a proposal to the union before it applies to the bankruptcy court to reject a collective bargaining agreement. The proposal must be limited to "those necessary modifications in the employees' benefits and protections that are necessary to permit the reorganization of the debtor * * *." 11 U.S.C. Sec. 1113(b)(1)(A). Royal made its prerejection proposal on March 18, 1986.
 
 
 10
 From that date through May 8, the parties engaged in limited negotiations, characterized by what Judge Abram termed "a stonewall" position adopted by the union. Royal Composing Room, 62 B.R. at 408. The union made only one counter-proposal, that coming on May 5, at the final pretrial conference. As to that proposal, the bankruptcy court found that it "provided significantly less economic relief to the Debtor than the interim relief which had been granted on March 21 * * *." Id. at 410. Between March 18 and May 8, there were only two short negotiating sessions, and the blame for the lack of a real effort to reach an accommodation was laid squarely upon the union by Judge Abram. Id. at 409 ("The Debtor was continuously available for and sought meetings. * * * At no time prior to May 5, did the union make a counter-proposal, comment item by item on the Debtor's financial situation, or state any reasons why it found the Debtor's request to be unfair or inequitable." (footnote omitted)).
 
 
 11
 Trial commenced on May 8. The union concentrated its efforts on demonstrating that Royal did not require the savings it had sought in its March 18 proposal, and therefore that the proposal was not limited to "necessary modifications" to the agreement.
 
 
 12
 The bankruptcy court, however, concluded that Royal's proposal was necessary to its successful reorganization, thereby clearing the threshold requirement for obtaining approval to reject its union contract. The court reasoned that where the union rejects the debtor's proposal without good cause, and does not engage in good faith negotiations toward a compromise, and the "debtor is in need of substantial relief", 62 B.R. at 408, the case for rejection of the contract is at its strongest, under the "balance of the equities" test contained in Sec. 1113. 11 U.S.C. Sec. 1113(c)(3).
 
 
 13
 The bankruptcy court went on to evaluate the debtor's need for relief of the scope represented by its proposal, finding that the charges were not "inherently unreasonable" and concluding that Royal's recent history of lost business and operating losses, combined with bleak projections about its future, made plain "that Royal established its need for relief on the order of magnitude" contained in its proposal. Id. at 418. Despite the somewhat inartful phrasing, the conclusion that the proposal was limited to necessary modifications is clear, and the court granted Royal's application to reject its union contract. The district court affirmed, 78 B.R. 671, and this appeal followed.
 
 DISCUSSION
 
 14
 On appeal, the union has narrowed the focus of its attack on Royal's proposal. It now contends that Royal failed to show the necessity for eliminating priority. The union implicitly argues that if any single vital element of the proposal--such as the elimination of priority--cannot be shown to be necessary within the meaning of Sec. 1113, the entire proposal cannot be deemed "necessary", and rejection of the contract must be denied. We reject the union's argument on two grounds. First, we disagree with its reading of Sec. 1113, and hold that, at least in these circumstances, the focus should be on the proposal as a whole. Second, the bankruptcy court's conclusion that Royal had, in fact, shown the necessity for eliminating priority amply is supported by the record and therefore is not clearly erroneous.
 
 
 15
 I. The Meaning of "Necessary" in Sec. 1113.
 
 
 16
 The term "necessary" appears twice in Sec. 1113. It requires the pre-rejection proposal to contain only "necessary modifications", and that the proposal be "necessary to permit the reorganization of the debtor." 11 U.S.C. Sec. 1113(b)(1)(A). We have interpreted the necessity requirement of Sec. 1113 as placing upon a debtor "the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully." Carey Transportation, 816 F.2d at 90 (emphasis added). That the approach followed by the bankruptcy court below was consistent with the one later adopted by this court in Carey Transportation is at least indicated by the fact that Judge Altimari's opinion quotes, fairly extensively and approvingly, from Judge Abram's opinion in the instant case. See id. at 89-90.
 
 
 17
 This conclusion is buttressed by the general inconsistency between holding, as we did in Carey Transportation, that the debtor's proposal need not be limited to "absolutely minimal" modifications, and holding, as the union would now have us do, that each and every vital element of the debtor's proposal must be shown independently to be necessary. At the least, focusing on a particular element vital to the proposal when the union does not bargain to change that element, rather than on the necessity for the package taken in toto, would undermine the interpretation of Sec. 1113 articulated in Carey Transportation.
 
 
 18
 At first blush, there seems to be some merit to the union's contention. If a particular element of the debtor's proposal is not needed, the proposal would seem not to be limited to necessary modifications--by definition, it would include an unnecessary modification.
 
 
 19
 Under that tautological reading of the statute, however, no proposal could ever truly be "necessary", since any single vital element of a proposal can hardly be "necessary" if it can be replaced by some alternative not included in the package which would achieve the same dollar savings for the debtor. Or, the union, as here, could argue that a specific element could substantially be modified, rather than eliminated, to achieve virtually the same savings and the same likelihood of a successful reorganization. In other words, the union's construction of the statute would enable it to play "hit-and-run": refusing to negotiate toward a compromise, safe in the knowledge that it will almost certainly be able to defeat a rejection application by attacking some vital modification by saying that it cannot be "necessary" if reasonable substitutes could have been offered. See Royal Composing Room, 62 B.R. at 407 ("[T]he rejection process becomes a game of Russian roulette in which the union will stand mute during negotiations in the expectation that the court is apt to find some aspect of the debtor's proposal unnecessary * * *.").
 
 
 20
 This is not to say that the union is always necessarily bound by the particular elements chosen by the debtor. If the debtor proposes an element objectionable to the union, the union has two options under Sec. 1113. It can argue that the part of the proposal it cannot accept was included by the employer in bad faith, in an effort to stalemate negotiations and allow it to obtain outright rejection rather than a negotiated compromise. If the union can make such a showing, the debtor would not be entitled to reject the labor contract under Carey Transportation, 816 F.2d at 90. The union attempted here to make such a showing in the bankruptcy court, see Royal Composing Room, 62 B.R. at 411, but the court explicitly rejected the argument, and the union does not challenge this finding as clearly erroneous.
 
 
 21
 Alternatively, the union can negotiate with the debtor. Although this is plainly what congress was seeking to encourage when it passed Sec. 1113, see id. at 405-06 (reviewing legislative history); In re Mile Hi Systems, Inc., 51 B.R. 509 (Bkrtcy.Colo.1985), rev'd on other grounds, 67 B.R. 114 (D.Colo.1986), it is apparent from Judge Abram's opinion below that this alternative was for some reason unacceptable to Local 607. If the union believes that a vital part of the proposal is unacceptable, it should enter into good faith negotiations aimed at moderating that element, or at substituting a measure less offensive to the union but achieving comparable savings for the debtor.
 
 
 22
 But, in this case, the union refused even to discuss the issue. Not only did the union take the position that priority was nonnegotiable; it went still further and refused to negotiate at all until priority was taken out of Royal's proposal. Id. at 410.
 
 
 23
 A union certainly is entitled to adopt a hard-line position, but if, as in this case, the union does so, it must recognize the risk inherent in the strategy. The balance of the equities nearly always will tip in favor of the party that seeks to reach a compromise and to that end negotiates in good faith. 11 U.S.C. Sec. 1113(c)(3). This is particularly true where, as here, the debtor not only seeks to negotiate in good faith, but also has adopted numerous cost-saving measures to try to improve the situation before declaring bankruptcy and seeking concessions from the union. See Royal Composing Room, 62 B.R. at 412 ("Union labor cost, Royal's single largest expense, is the only expense that has not been cut in the last four years."); In re Royal Composing Room, 78 B.R. 671, 672 (S.D.N.Y.1987) ("As of the end of 1985, Local 6 had not yet made any sacrifices or concessions."). Cf. In re Kentucky Truck Sales, 52 B.R. 797, 799 (Bkrtcy.W.D.Ky.1985) (crediting as important testimony that "the debtor has already made nearly all possible cost cuts in the nonlabor areas of its operation"). Moreover, the rejection of the proposal by the union in such circumstances will almost always without exception be without good cause, another prerequisite to the debtor obtaining rejection of the contract. 11 U.S.C. Sec. 1113(c)(2).
 
 
 24
 Put simply, where a union refuses to negotiate in order to obtain a different combination of modifications, it may not challenge the particular combination, or any vital element, contained in the debtor's proposal. So long as the total quantum of savings is necessary under the Carey Transportation standard, the union may not prevent rejection by belatedly attacking a specific element.
 
 
 25
 In terms of Sec. 1113, the burden on the parties to negotiate is best analyzed under Sec. 1113(c)(2), which permits rejection of the agreement only if the union has rejected the debtor's proposal without good cause. If the union seeks to negotiate compromises that meet its needs while preserving the debtor's required savings, it would be unlikely that its rejection of the proposal could be found to be lacking good cause. If, on the other hand, the union refuses to compromise, it is as unlikely it could be found to have acted with good cause.
 
 
 26
 Thus, the union here must stand or fall on the overall necessity of Royal's proposal. There is, however, no doubt that the district court's finding that Royal requires the full measure of savings represented in its proposal--and perhaps more--is not clearly erroneous. The total savings projected by Royal from its pre-rejection proposal was $4,000,778, for the years 1986-1989. See Royal Composing Room, 62 B.R. at 414. This amount was less than its projected losses operating under the union contract. Id. It may be true that the same goal might have been reached via a different route, had the union been willing to point the way it preferred. But Royal's chosen route was found to have been offered in good faith, and to cover the necessary, if not absolutely minimal, distance Royal had to travel. No more is necessary to justify rejection under Sec. 1113, as interpreted by Carey Transportation.
 
 
 27
 II. The Necessity of Eliminating Priority.
 
 
 28
 Even if we were to view the proper focus to be on the single element of eliminating priority, we would conclude that Royal demonstrated that it was a "necessary modification" as that term was defined in Carey Transportation. The bankruptcy court did not make an explicit finding as to the necessity for eliminating priority; nevertheless, such a finding is implicit in Judge Abram's opinion, and fully is supported by the record.
 
 
 29
 One of the major difficulties facing Royal was the relative inflexibility it had in utilizing its work force. The company had reached the point where it was employing more workers than it needed or could afford, but it could ill afford to lay off workers because, under the union contract's priority system, it would have had to lay off its most junior workers. Unlike the ordinary situation, where one could expect the most senior workers--those with the greatest experience--to be the most productive, Royal was in exactly the opposite position. Its senior personnel were least proficient on the computer machinery that has taken over the industry, and to compete Royal needed to retain employees who lacked seniority but were most efficient on the latest equipment. See id. at 417.
 
 
 30
 Thus, as the bankruptcy court held, "[I]n concept, the changes [in priority] are not inherently unreasonable." The union strenuously argues that concluding that priority changes are "not inherently unreasonable" is insufficient to justify the proposal, because it is far short of "necessary". This may well be true, but we view the bankruptcy court's statement as a natural response to the union's position that any changes at all in priority were unacceptable. Thus, the bankruptcy court began with the conclusion that priority was not off-limits, because changes in priority "are not inherently unreasonable."
 
 
 31
 But the bankruptcy court did not stop there. It went on to explain the need to eliminate, rather than merely modify, priority, in terms of Royal's need for flexibility in assignments and lay-offs. Judge Abram wrote, "The Debtor will in the future be faced with enormous competitive pressure which will require it to have maximum flexibility, including with respect to utilization of its unionized labor, in order to mold and adapt in a changing business environment." Id. at 416-17.
 
 
 32
 The union urges that Royal showed only a need for a short-term intrusion into priority, and to depart only on its current lay-offs to result in a work force that would achieve the savings Royal said it expected from completely eliminating priority.
 
 
 33
 There are two flaws in this argument. First, it ignores Royal's need for long-term flexibility in order to have a truly successful reorganization, one that results in a healthy company emerging from the process. A debtor's proposal need not be limited to the bare bones relief that will keep it going. See Carey Transportation, 816 F.2d at 89 ("[I]t becomes impossible to weigh necessity as to reorganization without looking into the debtor's ultimate future and estimating what the debtor needs to attain financial health."); Royal Composing Room, 62 B.R. at 418 ("A debtor can live on water alone for a short time but over the long haul it needs food to sustain itself and retain its vigor.").
 
 
 34
 Second, it is to be expected that Royal would demonstrate the difficulties with priority by showing its current need to depart from priority. This does not mean, however, that the showing supports only the necessity of the currently proposed lay-offs. As Judge Abram noted, "Projections are necessarily speculations about the future and are an art, rather than a science." Id. at 407. We will not hold Royal to show the necessity of every conceivable future use of the flexibility it now requires; it is enough that the bankruptcy court found it needs that flexibility. In an industry where rapid change has been the rule, and where the current need for intrusion into priority is well-established, the implicit finding of a general need to escape from the priority provision to help assure the future health of the company is not clearly erroneous.
 
 CONCLUSION
 
 35
 In short, Royal has shown a need for the level of savings it sought to achieve in its pre-rejection proposal. At least where the union has refused to bargain over particular elements of the proposal, it cannot attack any specific element in seeking to show the proposal is not "necessary". Here, in any event, the need for eliminating priority adequately was established and the bankruptcy court's factual findings support the conclusion that the proposal was limited to "necessary modifications", thus justifying rejection of Royal's contract with Local 607. We can only hope that the parties will now sit down and negotiate in good faith to reach a new agreement to replace the rejected contract, and reconcile the needs of company and workers alike in an industry where both sides are faced with dramatic, and often painful, changes.
 
 
 36
 The judgment of the district court is affirmed.
 
 FEINBERG, Chief Judge (dissenting):
 
 37
 This appeal raises the question of whether a statute designed to make it more difficult for employers in bankruptcy proceedings to reject labor contracts can be used in a way that Congress obviously sought to avoid. I dissent from the majority opinion principally because it misinterprets the applicable section of the Bankruptcy Code, and thereby unjustifiably allows an employer to use bankruptcy as a way of getting rid of a union contract.
 
 
 38
 As the majority notes, this case involves the proper interpretation of section 1113(b)(1)(A) of the Bankruptcy Code, which forbids rejection of a labor contract unless management (I use this as shorthand for the debtor-in-possession or the bankruptcy trustee) first makes "a proposal to the [union] ... which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor." Section 1113 is reproduced in the margin for convenient reference.[1] Because the majority agrees that interpreting 11 U.S.C. Sec. 1113 is at the heart of this case, it is remarkable that the majority almost completely ignores the legislative history of that section. That history reinforces what is implied by the statutory language itself: Congress intended section 1113 to make rejection of signed labor contracts difficult (but not impossible) and was especially concerned that bankruptcy not become a union-busting tool. Understanding the genesis of the statute so influences a proper reading of it that I think it worthwhile to set out the legislative history at length.
 
 I. Legislative History of Section 1113
 
 39
 In 1975, this court resolved the "tension between the Bankruptcy Act's policy in favor of giving the debtor a new start and the Labor Act's policy of encouraging enforcement of collective bargaining agreements," by allowing labor contracts to be rejected only if "it clearly appears to be the lesser of two evils and that, unless the agreement is rejected, [the debtor] will collapse and the employees will no longer have their jobs." Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc., 523 F.2d 164, 167, 172 (2d Cir.), cert. denied, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975). However, in 1984 the Supreme Court stated that REA made rejection of labor contracts too difficult, and instead adopted a balancing of the equities test, which allowed rejection if "the collective-bargaining agreement burdens the estate ... [and] the equities balance in favor of rejecting the labor contract." NLRB v. Bildisco & Bildisco, 465 U.S. 513, 526, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984). This test was widely viewed as so undemanding that it would "almost always lead to approval of a repudiation" because "it is a rare case in which ... relieving the employer of [the] burden [of the contract] will not ... aid the 'success of the reorganization.' " 130 Cong.Rec. S6184 (daily ed. May 22, 1984; statement of Sen. Packwood). The Court also held that management can reject the contract unilaterally without waiting for judicial approval.
 
 
 40
 On the very day the Supreme Court handed down its decision, Representative Rodino, chair of the House Judiciary Committee (which has jurisdiction over bankruptcy), introduced a bill (H.R. 4908) to overturn both aspects of Bildisco and to "require the bankruptcy judge to apply the standard used in the second circuit REA Express opinion." 130 Cong.Rec. 2989 (Feb. 22, 1984). As incorporated into the House's general bankruptcy reform bill (H.R. 5174), the bill permitted rejection only after a judicial hearing and even then only if the reorganization would otherwise fail and if the debtor had first proposed modifications to the agreement "necessary ... for successful financial reorganization." Id. at H1842 (daily ed. March 21, 1984). Opponents of the bill objected that the proposed standard for rejection of labor contracts was too high to allow needed reorganizations, but the bill passed the House on March 21, 1984. Id. at H1854 (daily ed. March 21, 1984).
 
 
 41
 In the senate, Senator Thurmond, chair of the Senate Judiciary Committee, introduced a bill that preserved Bildisco 's balance of the equities test but prohibited rejection of a contract until at least 30 days after a motion to do so. The bill was "reluctantly" accepted by the business community but rejected by labor. 130 Cong.Rec. at S6084 (daily ed. May 21, 1984). The next day, Senator Packwood offered as an amendment a substitute bill developed with the cooperation of labor leaders. The Packwood amendment required court approval before rejection and established a threshold requirement similar to what is now law--in order to ask a court to balance the equities, management must first make "a proposal ... providing for the minimum modifications in such employees benefits ... that would permit the reorganization." Id. at S6181 (daily ed. May 22, 1984). In other words, management had to limit itself by asking for only necessary changes in the labor contract and by not asking for changes that it thought desirable, but not, strictly speaking, necessary. Opponents criticized the Packwood amendment as "too stringent," Id. at S6191 (daily ed. May 22, 1984; statement of Sen. Hatch), and as making "it extremely difficult, if not impossible, for companies ... to obtain relief under Chapter 11." Id. at S6194 (daily ed. May 22, 1984; statement of Sen. Thurmond). Apparently fearing defeat in the Senate and persuaded that the House would approve the Packwood amendment, Id. at S6189 (daily ed. May 22, 1984), the opponents of the Packwood amendment succeeded in avoiding a vote on either proposal and in having the Senate go into the conference committee without a labor provision at all.
 
 
 42
 In the conference committee, the Senate conferees apparently offered to drop a provision to create 85 new judgeships that could be filled before the Presidential election that fall if the House dropped Rodino's provision and let Bildisco survive. Id. at S8888 (daily ed. June 29, 1984; statement of Sen. Thurmond), reprinted in 1984 U.S.Code Cong. & Ad.News 576, 582. The House refused. In the compromise that resulted, the conference committee modified the judicial authorization slightly and reported out, see H.R.Conf.Rep. No. 882, 98th Cong., 2d Sess. 61-62 (1984), the current version of section 1113, which takes most of its provisions from the Rodino and Packwood bills but contains a provision for interim relief pending a ruling on a rejection application, see Sec. 1113(e), that is inspired by the Thurmond bill.
 
 
 43
 The law enacted was thus not a complete victory for either side, In re Century Brass Products, Inc., 795 F.2d 265, 276 (2d Cir.1986): an employer (again, I use this as shorthand for the debtor-in-possession or trustee) might obtain interim relief from the bankruptcy court even though the labor contract was not yet rejected, but the weak Bildisco standard for rejection was "modified," see Century Brass Products, 795 F.2d at 272, and strengthened in a number of ways. Most notable in this context is that in order to be able to reject a contract in a bankruptcy proceeding management before applying for rejection must "make a proposal ... which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor." Sec. 1113(b)(1)(A) (emphasis supplied).
 
 
 44
 Thus, section 1113 in its final form is a pro-labor law. As its strongest opponent, Senator Thurmond, said in introducing the conference bill to the Senate, "were it not for the critical need to pass this bankruptcy bill [the Bankruptcy Amendments and Federal Judgeship Act of 1984, which reorganized the bankruptcy courts after the Supreme Court had ruled them unconstitutional], I could not have agreed to" section 1113, since its "procedures and standard are essentially the same as those of the Packwood amendment." Id. at S8888 (daily ed. June 29, 1984), reprinted in 1984 U.S.Code Cong. & Ad.News 576, 582. As Senator Packwood explained, "the debtor will not be able to exploit the bankruptcy procedure to rid itself of unwanted features of the labor agreement that have no relation to its financial condition.... The word 'necessary' inserted twice into this provision clearly emphasizes this required aspect of the proposal which the debtor must offer." Id. at S8898 (daily ed. June 29, 1984).
 
 
 45
 I have set out the legislative history at length because I believe it shows that a political battle was fought over section 1113, and that, as far as is relevant to management's proposal here, those who wished to make rejecting a labor contract more difficult were successful. It is against this background that the bankruptcy court's decision in this case should be judged.
 
 II. Discussion
 
 46
 As I understand it, in affirming that opinion the majority adopts alternative holdings. On the one hand, it says that "where a union refuses to negotiate in order to obtain a different combination of modifications [in a proposal], it may not challenge the particular combination, or any vital element, contained in the debtor's proposal. So long as the total quantum of savings is necessary ... the union may not prevent rejection." 848 F.2d at 349. This rule--which lowers the standard of necessity to punish the union for ignoring a gratuitously harmful modification--is essentially the same as the bankruptcy court's holding that because the union stonewalled after receiving the employer's proposal, the court would "focus on the larger picture: whether the Debtor has shown any necessity for modifications of the magnitude it proposed." In re Royal Composing Room, 62 B.R. 403, 411 (Bankr.S.D.N.Y.1986). Alternatively, the majority says that "[e]ven if we were to view the proper focus to be on the single element of eliminating priority, we would conclude that Royal demonstrated that it was a 'necessary modification.' " 848 F.2d at 349-50. Each holding will be considered in turn.
 
 
 47
 A. Negotiations and the Easier Standard for Necessity
 
 
 48
 It must be remembered that Section 1113 requires an employer to include only necessary modifications in its proposal. (Hereafter, I use "proposal" in the technical sense to refer to a proposal made by management to satisfy section 1113(b)(1)). The majority's first alternative holding purports to shift the analysis from the individual contractual modifications that constitute the employer's proposal to the proposal as a whole. However, the total savings generated by a proposal composed of several items cannot be determined without knowing the savings generated by each item. Moreover, in applying its rule, the majority considers only the savings to management from the proposal and ignores the harm to the union. This combined approach overlooks the fact that a particular proposed contract change may harm the union greatly and help the employer economically little, if at all. In addition, the majority's rule incorrectly looks to the Union's negotiating record to determine which definition of necessity to use.
 
 
 49
 The bankruptcy court acknowledged that it was departing from the statutory standard in considering the union's negotiating posture and in not weighing the employer's proposal on its own merits. It stated that "Although Code Sec. 1113(c)(1) starts with the debtor's proposal, this court declines to make the debtor's proposal itself the first and foremost topic of consideration as placing such primacy on the proposal inhibits, rather than fosters, ... prehearing negotiations." 62 B.R. at 406-07. This was contrary to Century Brass, 795 F.2d at 273, which tracked the statutory language in setting out the order of the three-part rejection test.
 
 
 50
 The statute gives no indication that the union's negotiating position should govern the definition, or application, of the standard of necessity. Moreover, although section 1113 does require bargaining between employees and financially unsuccessful management,[2] it does not absolutely obligate a union to negotiate regardless of the terms of management's proposal. To the contrary, the point of the requirement that the proposal contain only "necessary" modifications is to limit when a union can be required to reopen and renegotiate an already signed contract.
 
 
 51
 In contrast, the majority requires unions to negotiate over terms that save nothing--which by no stretch of the imagination can be called "necessary"--even though those terms mortally wound the union, because refusal to negotiate over a specific term bars the union from objecting to that term at the subsequent rejection hearing.[3] Consider the following hypothetical: a bankrupt company that needs to save $200,000 per year to reorganize successfully proposes the following as "necessary" modifications to its union contract: (1) reduce the wages of each of its 100 union employees by $2,000 per year; (2) eliminate the contract's "last-hired, first-fired" provision; and (3) eliminate a union-dues check-off provision that requires management to deduct union dues from employees' pay-checks but does not require management to contribute any funds to the union. Assume that provisions two and three save no money, and the union refuses to negotiate until they are removed from the bargaining table. Under the majority's first alternative approach, the contract could be rejected, since the total savings ($200,000) is necessary and since the union's refusal to negotiate bars it from contesting the details of the plan. The majority's approach is almost as absurd when a management proposal would save little money relative to the amount needed to be saved and the damage to the union is great, as is the case if, for example, eliminating the dues check-off provision might save management only a few dollars in accounting costs, but would substantially harm the union.
 
 
 52
 The majority thus allows individual anti-union modifications that save management little to lurk in court-approved proposals. The majority thereby disrupts the scheme of section 1113, since it effectively eliminates the word "necessary" from subsection (b)(1)(A) and leaves only the good faith and balance of the equities clauses to protect the union. This was not the result Congress intended when it overruled Bildisco, which said that only balancing the equities was required. The majority's rule also violates Truck Drivers Local 807 v. Carey Transportation, Inc., 816 F.2d 82 (2d Cir.1987), in which we held that a management proposal must be limited to "necessary, but not absolutely minimal" modifications, since under the majority's rule, even modifications that do not significantly help the reorganization are permitted. The majority suggests that the union could avoid an outrageous modification even if it refuses to negotiate by proving that it was made "in bad faith, in an effort to stalemate negotiations." However, this suggestion puts the cart before the horse by ignoring the statutory requirement that a necessary proposal (subsection (b)(1)) precede the good-faith negotiations required by subsection (b)(2). Moreover, management may make a good-faith mistake in thinking its proposal is necessary. The good-faith provisions therefore do not substitute for the necessity requirement.
 
 
 53
 If later cases nonetheless follow the majority's first alternative holding instead of its second, I would hope that they would make the best of a bad rule and interpret "negotiation" broadly. It should be enough for a union to (1) state the modifications to which it objects, and (2) give a short explanation of its objection. For example, the union might say "We object to elimination of dues check-off because it will hurt our independence and financial security, and management hasn't shown that it will save significant amounts of money." Once the union has begun negotiations, the usual Carey Transportation standard for "necessary"--and not the majority's alternative--would apply.
 
 B. Necessity
 
 54
 Based on the record before us, I also disagree with the majority's second alternative holding that "Even if we were to view the proper focus to be on the single element of eliminating priority, we would conclude that Royal demonstrated that it was a 'necessary modification' as ... defined in Carey Transportation."[4] 848 F.2d at 350. Priority is so important to the union that making its elimination "necessary" requires a stronger showing than has been made here.
 
 
 55
 Priority--called seniority in most businesses--has become one of the cornerstones of American unionism. Seniority is the most important, and often the only, equity workers have in their company. It is one of the chief protections a worker has from management's vagaries, and it preserves the self-esteem and financial security of workers who have devoted their lives to building a company. As the Supreme Court has said, " 'More than any other provision of the collective[-bargaining] agreement ... seniority affects the economic security of the individual employee covered by its terms.' " Franks v. Bowman Transportation Co., 424 U.S. 747, 766, 96 S.Ct. 1251, 1265, 47 L.Ed.2d 444 (1976). Priority is so important that the union president in this case said he was willing to "take whatever wage cut is necessary to keep this firm in business, but I don't think that we should be asked to give up priority for that purpose."
 
 
 56
 Given the generally recognized importance of seniority to unions, the union's refusal to negotiate as long as management sought to eliminate priority was understandable, even if unwise. More importantly, on the record in this case, the bankruptcy court could not have found that totally eliminating priority would have generated so much savings relative to the harm to the union--in the context of the savings necessary and the alternatives available--that the proposal could fairly be called "necessary."
 
 
 57
 The evidence was sufficient to support a finding that a limited intrusion into priority was necessary, but there was no specific, factual information proving that priority had to be totally and permanently eliminated. The bankruptcy court, quoted with approval by the majority 848 F.2d 350, excuses this failure with generalities like "A debtor can live on water alone for a short time but over the long haul it needs food to sustain itself and retain its vigor," 62 B.R. at 418, and "Projections are necessarily speculations about the future and are an art," 62 B.R. at 407, but truisms do not substitute for evidence. Although I agree with the majority that we should "not hold Royal to show the necessity of every conceivable future use of the flexibility" created by eliminating priority, I disagree that "it is enough that the bankruptcy court found it needs that flexibility." (p. 350). To be upheld on appeal, the bankruptcy court's finding must be based on evidence.
 
 
 58
 Moreover, the bankruptcy court did not find that totally eliminating priority was necessary. The majority admits that the court did not make its findings explicit, but says that "such a finding is implicit." (p. 349). I disagree. The bankruptcy court stated that "The Union has questioned the need for any alteration of existing priority ... rules. The court is persuaded that ... some intrusion on the priority system was not inherently unreasonable" since "[t]he Debtor will in the future be faced with enormous competitive pressure which will require it to have maximum flexibility, including with respect to utilization of its unionized labor, in order to mold and adapt in a changing business environment." 62 B.R. at 417, 416-17 (emphasis added).
 
 
 59
 The first finding--that "some intrusion on the priority system was not inherently unreasonable "--does not even approach a finding that total elimination of priority is necessary. The second statement--about the "enormous competitive pressure" requiring "maximum flexibility"--is so general as to be meaningless. It could be said of any bankrupt company, since presumably a company would not be bankrupt without "enormous competitive pressure" and since management always wants to have "maximum flexibility." Indeed, one of a union's key functions is to decrease management's flexibility by giving workers a role in their own work, and increasing flexibility is often code for ending unionization. Similarly, under the bankruptcy court's reasoning, almost any bankrupt company could eliminate seniority without proving any particularized need. Congress did not intend Section 1113 to be management's tool for eliminating seniority provisions. Instead, Congress required the employer to prove specific facts showing that the specific relief requested is necessary in its particular circumstances. On this record, the employer never met its burden, the bankruptcy court applied the wrong standard and, in any event, did not make particularized findings. At the very least, I would remand for further factual findings.
 
 III. Remand for Factual Clarification
 
 60
 Other aspects of the proceedings below also suggest that, in any event, a remand would have been appropriate and that this is the wrong occasion on which to announce a new interpretation of the necessary-proposal requirement.
 
 A. Uncertainty About Proposal's Content
 
 61
 The majority opinion seems to be premised on the assumption--shared by Royal and the union--that the proposal at issue here is the single set of modifications Royal asked for orally on March 18.[5] This premise was not shared by the bankruptcy court, which seems to have considered a variety of suggested modifications under the rubric "proposal," but did not isolate any single proposal to determine its necessity. 62 B.R. at 410 n. 15 ("Analysis of the differences [between the various proposals] is not material to the motion.") This was error, because the statute envisions that the bankruptcy court scrutinize a single proposal. Because the bankruptcy court did not have a particular proposal in mind, it could not have determined the necessity of a particular proposal, and because I do not believe that we should evaluate a proposal without the benefit of the bankruptcy court's assessment of it, I would at the very least remand for consideration of a single proposal. However, even if I were inclined to review the March 18 proposal in the first instance, I could not do so because the exact content of that proposal is not in the record.
 
 
 62
 As the majority states, both sides have focused on the modification relating to priority. However, because there was no contemporaneous, written record of the March 18 proposal and because the bankruptcy court did not make clear findings about that proposal's content, see 62 B.R. at 410 n. 16, it is not clear from the record whether the March 18 proposal sought to eliminate priority, totally or partially. The March 3 written request for changes did not mention priority at all, see 62 B.R. at 408-09 n. 9, and when the bankruptcy judge asked "Is the proposal that the debtor eliminate seniority issues altogether or that the debtor obtain a one-time ... window," the debtor's chief negotiator answered "it's somewhere in the middle.... I anticipate that there will be a one-time problem of excessing 5 or 6 people ... [but] I will then reserve the right to again go by way of merit selection rather than seniority.... At no time has the debtor ever asked for what you describe as a cart[e] blanche right to elimi[na]te seniority.... Most of the aspects that seniority has we're not asking for change." Cf. 62 B.R. at 413 (management request in January to eliminate five employees, not all of seniority). If the proposal had clearly asked for a small, temporary incursion into priority, I might feel differently about the necessity of the modification, as indicated above. However, on the record before us I cannot tell what the proposal was and therefore cannot judge whether it was necessary.
 
 
 63
 Analyzing the proposal as a whole, which the majority does, is similarly impossible because one cannot determine the proposal's total savings without knowing what the specific modifications are and how much each will save. Because this factual issue is at the heart of the appeal and because it is a basic principle of federal jurisprudence that courts pass on legal questions only in concrete factual situations, I would not use this case to announce a new interpretation of the necessary proposal requirement. Instead, I would remand for factual findings with a suggestion that bankruptcy courts in the future not consider rejection applications unless accompanied by a copy of the clear, written, dated proposal by management to a union.
 
 B. Timing of Proposal
 
 64
 There is another assumption shared by the parties and the majority but not by the bankruptcy court. The former apparently assume, and I tentatively am inclined to agree, that the proper proposal to evaluate is one made "[s]ubsequent to filing a petition and prior to filing an application," Sec. 1113(b)(1) (emphasis added), which in this case is between March 14 and March 19. However, the bankruptcy court said it would consider the proposal "to the extent the proposal was made prior to the commencement of the rejection hearing," 62 B.R. at 407 (emphasis added), which was May 8. In so holding, the court relied on section 1113(c), which says that "[t]he court shall approve an application for rejection ... only if the court finds that--(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1)." (emphasis added). Under this reading of the statute, management can continue making proposals all the way to the rejection hearing, and only the last one is subject to the necessity test. The question is important because before we can evaluate the necessity of a proposal we must know its terms. Since the issue was neither briefed by the parties nor ruled on by the majority, I do not express a firm view. I note the issue for the future and to point out the fundamental confusion in the record, confusion that should have precluded the majority from even considering whether the total elimination of priority was necessary.
 
 
 65
 For the reasons stated above, I dissent from the majority's unnecessarily broad decision that conflicts with the intent of Congress as expressed in Section 1113. I would either reverse or, at the least, remand for clarification.
 
 
 
 [1]
 Section 1113 of the Bankruptcy Code reads as follows:
 Sec. 1113. Rejection of collective bargaining agreements
 (a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.
 (b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section 'trustee' shall include a debtor in possession), shall--
 (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
 (B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.
 (2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.
 (c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that--
 (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
 (2) the authorized representative of the employees has refused to accept such proposal without good cause; and
 (3) the balance of the equities clearly favors rejection of such agreement.
 (d)(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. The court may extend the time for the commencement of such hearing for a period not exceeding seven days where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.
 (2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interests of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to. If the court does not rule on such application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees' representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.
 (3) The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.
 (e) If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.
 (f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.
 
 
 [2]
 I believe that Congress intended at least some bargaining to occur between the time management makes a proposal and the time it applies to reject the contract. Management should therefore make its proposal sufficiently in advance of its application to allow negotiations. Cf. Wheeling-Pittsburgh Steel Co. v. United Steelworkers of America, 791 F.2d 1074, 1077, 1093 (3d Cir.1986) (three weeks between proposal and application). In this case, Royal seems to have prepared its application before making its proposal on March 18 and filed the application the next day. This behavior, while not necessarily proof of bad faith, prevented meaningful negotiations after bankruptcy had become a reality but before management's inflammatory attempt to abrogate the contract completely. Such behavior should be discouraged
 
 
 [3]
 The majority says that the union is barred from challenging "vital" elements of the proposal. However, the majority never defines "vital," which is not a statutory term. If "vital" means "necessary," then the word adds nothing. If it means something other than necessary, then adding the term creates another layer of confusion and opportunity for litigation
 
 
 [4]
 As discussed in Part III, I would not reach these issues because the record is unclear about whether the proposal asked for the total elimination of priority. Nonetheless, in order to register my disagreement with the majority on these matters, I will assume (as it does) that the proposal sought the total elimination of priority
 
 
 [5]
 Royal's application for rejection was evidently prepared before the March 18 discussion with the union, since the application states "A meeting has been scheduled for Tuesday morning, March 18." Daniel Haberman, chairman of Royal's board, testified about the March 18 meeting as follows:
 The union's lawyer asked for our proposal, and what happened was, the two-part answer is, one, we gave them--Mr. Rosen [Royal's lawyer] said that our March 3rd written proposal ... that our March 3rd written proposal as amplified by what we told them verbally at the March 18th meeting--in other words, most of this is in the March 3rd written proposal--excuse me--in the March 3rd written request that we gave to the union on the afternoon of March 3rd. In addition to that the other items we told the union verbally in the March 18th meeting. The problem that we had there was--the problem that I have, that afternoon we were going to a conference with Judge Abram on the interim relief and, so, the proposal was a combination--most of it was in writing, that is, and was accepted....