FEINBERG, Chief Judge
(dissenting):
This appeal raises the question of whether a statute designed to make it more difficult for employers in bankruptcy proceedings to reject labor contracts can be used in a way that Congress obviously sought to avoid. I dissent from the majority opinion principally because it misinterprets the applicable section of the Bankruptcy Code, and thereby unjustifiably allows an employer to use bankruptcy as a way of getting rid of a union contract.
As the majority notes, this case involves the proper interpretation of section 1113(b)(1)(A) of the Bankruptcy Code, which forbids rejection of a labor contract unless management (I use this as shorthand for the debtor-in-possession or the bankruptcy trustee) first makes “a proposal to the [union] ... which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor.” Section 1113 is reproduced in the margin for convenient reference.[1] Because the majority agrees that interpreting 11 U.S.C. § 1113 is at the heart of this *352 case, it is remarkable that the majority almost completely ignores the legislative history of that section. That history reinforces what is implied by the statutory language itself: Congress intended section 1113 to make rejection of signed labor contracts difficult (but not impossible) and was especially concerned that bankruptcy not become a union-busting tool. Understanding the genesis of the statute so influences a proper reading of it that I think it worthwhile to set out the legislative history at length.
I. Legislative History of Section 1113
In 1975, this court resolved the “tension between the Bankruptcy Act’s policy in favor of giving the debtor a new start and the Labor Act’s policy of encouraging enforcement of collective bargaining agreements,” by allowing labor contracts to be rejected only if “it clearly appears to be the lesser of two evils and that, unless the agreement is rejected, [the debtor] will collapse and the employees will no longer have their jobs.” Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc., 523 F.2d 164, 167, 172 (2d Cir.), cert. denied, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975). However, in 1984 the Supreme Court stated that REA made rejection of labor contracts too difficult, and instead adopted a balancing of the equities test, which allowed rejection if “the collective-bargaining agreement burdens the estate ... [and] the equities balance in favor of rejecting the labor contract.” NLRB v. Bildisco & Bildisco, 465 U.S. 513, 526, 104 S.Ct. 1188, 1196, 79 L.Ed. 2d 482 (1984). This test was widely viewed as so undemanding that it would “almost always lead to approval óf a repudiation” because “it is a rare case in which ... relieving the employer of [the] burden [of the contract] will not ... aid the ‘success of the reorganization.’ ” 130 Cong.Rec. S6184 (daily ed. May 22, 1984; statement of Sen. Packwood). The Court also held that management can reject the contract unilaterally without waiting for judicial approval.
On the very day the Supreme Court handed down its decision, Representative Rodino, chair of the House Judiciary Committee (which has jurisdiction over bankruptcy), introduced a bill (H.R. 4908) to overturn both aspects of Bildisco and to “require the bankruptcy judge to apply the standard used in the second circuit REA Express opinion.” 130 Cong.Rec. 2989 (Feb. 22, 1984). As incorporated into the House’s general bankruptcy reform bill (H.R. 5174), the bill permitted rejection only after a judicial hearing and even then only if the reorganization would otherwise fail and if the debtor had first proposed modifications to the agreement “necessary ... for successful financial reorganization.” Id. at H1842 (daily ed. March 21, 1984). Opponents of the bill objected that the proposed standard for rejection of labor contracts was too high to allow needed reorganizations, but the bill passed the House on March 21, 1984. Id. at H1854 (daily ed. March 21, 1984).
*353 In the senate, Senator Thurmond, chair of the Senate Judiciary Committee, introduced a bill that preserved Bildisco’s balance of the equities test but prohibited rejection of a contract until at least 30 days after a motion to do so. The bill was “reluctantly” accepted by the business community but rejected by labor. 130 Cong.Rec. at S6084 (daily ed. May 21, 1984). The next day, Senator Packwood offered as an amendment a substitute bill developed with the cooperation of labor leaders. The Packwood amendment required court approval before rejection and established a threshold requirement similar to what is now law — in order to ask a court to balance the equities, management must first make “a proposal ... providing for the minimum modifications in such employees benefits ... that would permit the reorganization.” Id. at S6181 (daily ed. May 22, 1984). In other words, management had to limit itself by asking for only necessary changes in the labor contract and by not asking for changes that it thought desirable, but not, strictly speaking, necessary. Opponents criticized the Packwood amendment as “too stringent,” Id. at S6191 (daily ed. May 22, 1984; statement of Sen. Hatch), and as making “it extremely difficult, if not impossible, for companies ... to obtain relief under Chapter 11.” Id. at S6194 (daily ed. May 22,1984; statement of Sen. Thurmond). Apparently fearing defeat in the Senate and persuaded that the House would approve the Packwood amendment, Id. at S6189 (daily ed. May 22, 1984), the opponents of the Packwood amendment succeeded in avoiding a vote on either proposal and in having the Senate go into the conference committee without a labor provision at all.
In the conference committee, the Senate conferees apparently offered to drop a provision to create 85 new judgeships that could be filled before the Presidential election that fall if the House dropped Rodino’s provision and let Bildisco survive. Id. at S8888 (daily ed. June 29, 1984; statement of Sen. Thurmond), reprinted in 1984 U.S. Code Cong. & AcLNews 576, 582. The House refused. In the compromise that resulted, the conference committee modified the judicial authorization slightly and reported out, see H.R.Conf.Rep. No. 882, 98th Cong., 2d Sess. 61-62 (1984), the current version of section 1113, which takes most of its provisions from the Rodino and Packwood bills but contains a provision for interim relief pending a ruling on a rejection application, see § 1113(e), that is inspired by the Thurmond bill.
The law enacted was thus not a complete victory for either side, In re Century Brass Products, Inc., 795 F.2d 265, 276 (2d Cir.1986): an employer (again, I use this as shorthand for the debtor-in-possession or trustee) might obtain interim relief from the bankruptcy court even though the labor contract was not yet rejected, but the weak Bildisco standard for rejection was “modified,” see Century Brass Products, 795 F.2d at 272, and strengthened in a number of ways. Most notable in this context is that in order to be able to reject a contract in a bankruptcy proceeding management before applying for rejection must “make a proposal ... which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor.” § 1113(b)(1)(A) (emphasis supplied).
Thus, section 1113 in its final form is a pro-labor law. As its strongest opponent, Senator Thurmond, said in introducing the conference bill to the Senate, “were it not for the critical need to pass this bankruptcy bill [the Bankruptcy Amendments and Federal Judgeship Act of 1984, which reorganized the bankruptcy courts after the Supreme Court had ruled them unconstitutional], I could not have agreed to” section 1113, since its “procedures and standard are essentially the same as those of the Packwood amendment.” Id. at S8888 (daily ed. June 29, 1984), reprinted in 1984 ILS.Code Cong. & Ad.News 576, 582. As Senator Packwood explained, “the debtor will not be able to exploit the bankruptcy procedure to rid itself of unwanted features of the labor agreement that have no relation to its financial condition.... The word ‘necessary’ inserted twice into this provision clearly emphasizes this required aspect of the proposal which the debtor *354 must offer.” Id. at S8898 (daily ed. June 29, 1984).
I have set out the legislative history at length because I believe it shows that a political battle was fought over section 1113, and that, as far as is relevant to management’s proposal here, those who wished to make rejecting a labor contract more difficult were successful. It is against this background that the bankruptcy court’s decision in this case should be judged.
II. Discussion
As I understand it, in affirming that opinion the majority adopts alternative holdings. On the one hand, it says that “where a union refuses to negotiate in order to obtain a different combination of modifications [in a proposal], it may not challenge the particular combination, or any vital element, contained in the debtor’s proposal. So long as the total quantum of savings is necessary ... the union may not prevent rejection.” 848 F.2d at 349. This rule — which lowers the standard of necessity to punish the union for ignoring a gratuitously harmful modification — is essentially the same as the bankruptcy court’s holding that because the union stonewalled after receiving the employer’s proposal, the court would “focus on the larger picture: whether the Debtor has shown any necessity for modifications of the magnitude it proposed.” In re Royal Composing Room, 62 B.R. 403, 411 (Bankr.S.D.N.Y.1986). Alternatively, the majority says that “[e]ven if we were to view the proper focus to be on the single element of eliminating priority, we would conclude that Royal demonstrated that it was a ‘necessary modification.’ ” 848 F.2d at 349-50. Each holding will be considered in turn.
A. Negotiations and the Easier Standard for Necessity
It must be remembered that Section 1113 requires an employer to include only necessary modifications in its proposal. (Hereafter, I use “proposal” in the technical sense to refer to a proposal made by management to satisfy section 1113(b)(1)). The majority’s first alternative holding purports to shift the analysis from the individual contractual modifications that constitute the employer’s proposal to the proposal as a whole. However, the total savings generated by a proposal composed of several items cannot be determined without knowing the savings generated by each item. Moreover, in applying its rule, the majority considers only the savings to management from the proposal and ignores the harm to the union. This combined approach overlooks the fact that a particular proposed contract change may harm the union greatly and help the employer economically little, if at all. In addition, the majority’s rule incorrectly looks to the Union’s negotiating record to determine which definition of necessity to use.
The bankruptcy court acknowledged that it was departing from the statutory standard in considering the union’s negotiating posture and in not weighing the employer’s proposal on its own merits. It stated that “Although Code § 1113(c)(1) starts with the debtor’s proposal, this court declines to make the debtor’s proposal itself the first and foremost topic of consideration as placing such primacy on the proposal inhibits, rather than fosters, ... prehearing negotiations.” 62 B.R. at 406-07. This was contrary to Century Brass, 795 F.2d at 273, which tracked the statutory language in setting out the order of the three-part rejection test.
The statute gives no indication that the union’s negotiating position should govern the definition, or application, of the standard of necessity. Moreover, although section 1113 does require bargaining between employees and financially unsuccessful management,[2] it does not absolutely ob *355 ligate a union to negotiate regardless of the terms of management’s proposal. To the contrary, the point of the requirement that the proposal contain only “necessary” modifications is to limit when a union can be required to reopen and renegotiate an already signed contract.
In contrast, the majority requires unions to negotiate over terms that save nothing— which by no stretch of the imagination can be called “necessary” — even though those terms mortally wound the union, because refusal to negotiate over a specific term bars the union from objecting to that term at the subsequent rejection hearing.[3] Consider the following hypothetical: a bankrupt company that needs to save $200,000 per year to reorganize successfully proposes the following as “necessary” modifications to its union contract: (1) reduce the wages of each of its 100 union employees by $2,000 per year; (2) eliminate the contract’s “last-hired, first-fired” provision; and (3) eliminate a union-dues check-off provision that requires management to deduct union dues from employees’ paychecks but does not require management to contribute any funds to the union. Assume that provisions two and three save no money, and the union refuses to negotiate until they are removed from the bargaining table. Under the majority’s first alternative approach, the contract could be rejected, since the total savings ($200,000) is necessary and since the union’s refusal to negotiate bars it from contesting the details of the plan. The majority’s approach is almost as absurd when a management proposal would save little money relative to the amount needed to be saved and the damage to the union is great, as is the case if, for example, eliminating the dues checkoff provision might save management only a few dollars in accounting costs, but would substantially harm the union.
The majority thus allows individual anti-union modifications that save management little to lurk in court-approved proposals. The majority thereby disrupts the scheme of section 1113, since it effectively eliminates the word “necessary” from subsection (b)(1)(A) and leaves only the good faith and balance of the equities clauses to protect the union. This was not the result Congress intended when it overruled Bil-disco, which said that only balancing the equities was required. The majority’s rule also violates Truck Drivers Local 807 v. Carey Transportation, Inc., 816 F.2d 82 (2d Cir.1987), in which we held that a management proposal must be limited to “necessary, but not absolutely minimal” modifications, since under the majority’s rule, even modifications that do not significantly help the reorganization are permitted. The majority suggests that the union could avoid an outrageous modification even if it refuses to negotiate by proving that it was made “in bad faith, in an effort to stalemate negotiations.” However, this suggestion puts the cart before the horse by ignoring the statutory requirement that a necessary proposal (subsection (b)(1)) precede the good-faith negotiations required by subsection (b)(2). Moreover, management may make a good-faith mistake in thinking its proposal is necessary. The good-faith provisions therefore do not substitute for the necessity requirement.
If later cases nonetheless follow the majority’s first alternative holding instead of its second, I would hope that they would make the best of a bad rule and interpret “negotiation” broadly. It should be enough for a union to (1) state the modifications to which it objects, and (2) give a short explanation of its objection. For example, the union might say “We object to elimination of dues check-off because it will hurt our independence and financial securi *356 ty, and management hasn’t shown that it will save significant amounts of money.” Once the union has begun negotiations, the usual Carey Transportation standard for “necessary” — and not the majority’s alternative — would apply.
B. Necessity
Based on the record before us, I also disagree with the majority’s second alternative holding that “Even if we were to view the proper focus to be on the single element of eliminating priority, we would conclude that Royal demonstrated that it was a ‘necessary modification’ as ... defined in Carey Transportation.”[4] 848 F.2d at 350. Priority is so important to the union that making its elimination “necessary” requires a stronger showing than has been made here.
Priority — called seniority in most businesses — has become one of the cornerstones of American unionism. Seniority is the most important, and often the only, equity workers have in their company. It is one of the chief protections a worker has from management’s vagaries, and it preserves the self-esteem and financial security of workers who have devoted their lives to building a company. As the Supreme Court has said, “‘More than any other provision of the collective[-bargaining] agreement ... seniority affects the economic security of the individual employee covered by its terms.’” Franks v. Bowman Transportation Co., 424 U.S. 747, 766, 96 S.Ct. 1251, 1265, 47 L.Ed.2d 444 (1976). Priority is so important that the union president in this case said he was willing to “take whatever wage cut is necessary to keep this firm in business, but I don’t think that we should be asked to give up priority for that purpose.”
Given the generally recognized importance of seniority to unions, the union’s refusal to negotiate as long as management sought to eliminate priority was understandable, even if unwise. More importantly, on the record in this case, the bankruptcy court could not have found that totally eliminating priority would have generated so much savings relative to the harm to the union — in the context of the savings necessary and the alternatives available — that the proposal could fairly be called “necessary.”
The evidence was sufficient to support a finding that a limited intrusion into priority was necessary, but there was no specific, factual information proving that priority had to be totally and permanently eliminated. The bankruptcy court, quoted with approval by the majority 848 F.2d 350, excuses this failure with generalities like “A debtor can live on water alone for a short time but over the long haul it needs food to sustain itself and retain its vigor,” 62 B.R. at 418, and “Projections are necessarily speculations about the future and are an art,” 62 B.R. at 407, but truisms do not substitute for evidence. Although I agree with the majority that we should “not hold Royal to show the necessity of every conceivable future use of the flexibility” created by eliminating priority, I disagree that “it is enough that the bankruptcy court found it needs that flexibility.” (p. 350). To be upheld on appeal, the bankruptcy court’s finding must be based on evidence.
Moreover, the bankruptcy court did not find that totally eliminating priority was necessary. The majority admits that the court did not make its findings explicit, but says that “such a finding is implicit.” (p. 349). I disagree. The bankruptcy court stated that “The Union has questioned the need for any alteration of existing priority ... rules. The court is persuaded that ... some intrusion on the priority system was not inherently unreasonable” since “[t]he Debtor will in the future be faced with enormous competitive pressure which will require it to have maximum flexibility, including with respect to utilization of its unionized labor, in order to mold and adapt *357 in a changing business environment.” 62 B.R. at 417, 416-17 (emphasis added).
The first finding — that “some intrusion on the priority system was not inherently unreasonable ” — does not even approach a finding that total elimination of priority is necessary. The second statement — about the “enormous competitive pressure” requiring “maximum flexibility” — is so general as to be meaningless. It could be said of any bankrupt company, since presumably a company would not be bankrupt without “enormous competitive pressure” and since management always wants to have “maximum flexibility.” Indeed, one of a union’s key functions is to decrease management’s flexibility by giving workers a role in their own work, and increasing flexibility is often code for ending unionization. Similarly, under the bankruptcy court’s reasoning, almost any bankrupt company could eliminate seniority without proving any particularized need. Congress did not intend Section 1113 to be management’s tool for eliminating seniority provisions. Instead, Congress required the employer to prove specific facts showing that the specific relief requested is necessary in its particular circumstances. On this record, the employer never met its burden, the bankruptcy court applied the wrong standard and, in any event, did not make particularized findings. At the very least, I would remand for further factual findings.
III. Remand for Factual Clarification
Other aspects of the proceedings below also suggest that, in any event, a remand would have been appropriate and that this is the wrong occasion on which to announce a new interpretation of the necessary-proposal requirement.
A. Uncertainty About Proposal’s Content
The majority opinion seems to be premised on the assumption — shared by Royal and the union — that the proposal at issue here is the single set of modifications Royal asked for orally on March 18.[5] This premise was not shared by the bankruptcy court, which seems to have considered a variety of suggested modifications under the rubric “proposal,” but did not isolate any single proposal to determine its necessity. 62 B.R. at 410 n. 15 (“Analysis of the differences [between the various proposals] is not material to the motion.”) This was error, because the statute envisions that the bankruptcy court scrutinize a single proposal. Because the bankruptcy court did not have a particular proposal in mind, it could not have determined the necessity of a particular proposal, and because I do not believe that we should evaluate a proposal without the benefit of the bankruptcy court’s assessment of it, I would at the very least remand for consideration of a single proposal. However, even if I were inclined to review the March 18 proposal in the first instance, I could not do so because the exact content of that proposal is not in the record.
As the majority states, both sides have focused on the modification relating to priority. However, because there was no contemporaneous, written record of the March 18 proposal and because the bankruptcy court did not make clear findings about that proposal’s content, see 62 B.R. at 410 n. 16, it is not clear from the record whether the March 18 proposal sought to elimi *358 nate priority, totally or partially. The March 3 written request for changes did not mention priority at all, see 62 B.R. at 408-09 n. 9, and when the bankruptcy judge asked “Is the proposal that the debt- or eliminate seniority issues altogether or that the debtor obtain a one-time ... window,” the debtor’s chief negotiator answered “it’s somewhere in the middle.... I anticipate that there will be a one-time problem of excessing 5 or 6 people ... [but] I will then reserve the right to again go by way of merit selection rather than seniority.... At no time has the debtor ever asked for what you describe as a cart[e] blanche right to elimi[na]te seniority.... Most of the aspects that seniority has we’re not asking for change.” Cf. 62 B.R. at 413 (management request in January to eliminate five employees, not all of seniority). If the proposal had clearly asked for a small, temporary incursion into priority, I might feel differently about the necessity of the modification, as indicated above. However, on the record before us I cannot tell what the proposal was and therefore cannot judge whether it was necessary.
Analyzing the proposal as a whole, which the majority does, is similarly impossible because one cannot determine the proposal’s total savings without knowing what the specific modifications are and how much each will save. Because this factual issue is at the heart of the appeal and because it is a basic principle of federal jurisprudence that courts pass on legal questions only in concrete factual situations, I would not use this case to announce a new interpretation of the necessary proposal requirement. Instead, I would remand for factual findings with a suggestion that bankruptcy courts in the future not consider rejection applications unless accompanied by a copy of the clear, written, dated proposal by management to a union.
B. Timing of Proposal
There is another assumption shared by the parties and the majority but not by the bankruptcy court. The former apparently assume, and I tentatively am inclined to agree, that the proper proposal to evaluate is one made “[subsequent to filing a petition and prior to filing an application,” § 1113(b)(1) (emphasis added), which in this case is between March 14 and March 19. However, the bankruptcy court said it would consider the proposal “to the extent the proposal was made prior to the commencement of the rejection hearing,” 62 B.R. at 407 (emphasis added), which was May 8. In so holding, the court relied on section 1113(c), which says that “[t]he court shall approve an application for rejection ... only if the court finds that — (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1).” (emphasis added). Under this reading of the statute, management can continue making proposals all the way to the rejection hearing, and only the last one is subject to the necessity test. The question is important because before we can evaluate the necessity of a proposal we must know its terms. Since the issue was neither briefed by the parties nor ruled on by the majority, I do not express a firm view. I note the issue for the future and to point out the fundamental confusion in the record, confusion that should have precluded the majority from even considering whether the total elimination of priority was necessary.
For the reasons stated above, I dissent from the majority’s unnecessarily broad decision that conflicts with the intent of Congress as expressed in Section 1113. I would either reverse or, at the least, remand for clarification.

. Section 1113 of the Bankruptcy Code reads as follows:
§ 1113. Rejection of collective bargaining agreements
(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.
(b)(1) Subsequent to filing a petition and pri- or to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section 'trustee' shall include a debtor in possession), shall—
(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.
(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.
(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—
(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
(2) the authorized representative of the employees has refused to accept such proposal without good cause; and
(3) the balance of the equities clearly favors rejection of such agreement.
(d)(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. The court may extend the time for the commencement of such hearing for a period not exceeding seven days where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.
(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interests of justice, the court may extend such time *352 fer ruling for such additional period as the trustee and the employees’ representative may agree to. If the court does not rule on such application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees’ representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.
(3) The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee’s proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.
(e) If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor’s business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.
(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

. I believe that Congress intended at least some bargaining to occur between the time management makes a proposal and the time it applies to reject the contract. Management should therefore make its proposal sufficiently in advance of its application to allow negotiations. Cf. Wheeling-Pittsburgh Steel Co. v. United Steelworkers of America, 791 F.2d 1074, 1077, 1093 (3d Cir.1986) (three weeks between proposal and application). In this case, Royal seems to *355 have prepared its application before making its proposal on March 18 and filed the application the next day. This behavior, while not necessarily proof of bad faith, prevented meaningful negotiations after bankruptcy had become a reality but before management’s inflammatory attempt to abrogate the contract completely. Such behavior should be discouraged.

. The majority says that the union is barred from challenging "vital” elements of the proposal. However, the majority never defines "vital," which is not a statutory term. If “vital” means "necessary,” then the word adds nothing. If it means something other than necessary, then adding the term creates another layer of confusion and opportunity for litigation.

. As discussed in Part III, I would not reach these issues because the record is unclear about whether the proposal asked for the total elimination of priority. Nonetheless, in order to register my disagreement with the majority on these matters, I will assume (as it does) that the proposal sought the total elimination of priority.

. Royal's application for rejection was evidently prepared before the March 18 discussion with the union, since the application states “A meeting has been scheduled for Tuesday morning, March 18." Daniel Haberman, chairman of Royal's board, testified about the March 18 meeting as follows:
The union's lawyer asked for our proposal, and what happened was, the two-part answer is, one, we gave them — Mr. Rosen [Royal’s lawyer] said that our March 3rd written proposal ... that our March 3rd written proposal as amplified by what we told them verbally at the March 18th meeting — in other words, most of this is in the March 3rd written proposal — excuse me — in the March 3rd written request that we gave to the union on the afternoon of March 3rd. In addition to that the other items we told the union verbally in the March 18th meeting. The problem that we had there was — the problem that I have, that afternoon we were going to a conference with Judge Abram on the interim relief and, so, the proposal was a combination — most of it was in writing, that is, and was accepted. ...